## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

---

| | |
|---|---|
| USAA GENERAL INDEMNITY ) | |
| COMPANY, as Subrogee of Claude Benoit,) | CIVIL ACTION NO.: 3:16-cv-498-JWD-RLB |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | |
| ) | |
| OMEGA FLEX, INC. ) | |
| A Foreign Corporation ) | December 13, 2017 |
| *Defendant.* ) | |

---

## DEFENDANT OMEGA FLEX, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF PLAINTIFF'S EXPERTS

Respectfully submitted,

Dated December 13, 2017

Defendant Omega Flex, Inc.,

BY:    */s/ David R. Frohn*
**DAVID R. FROHN**, Bar No. 5758
MANION GAYNOR & MANNING LLP
2201 Lake Street, Suite 106
Lake Charles, LA  70601-7199
Telephone:    (337) 419-1929
Facsimile:     (337) 564-6899
Email: dfrohn@mgmlaw.com

BY:    */s/ Cullen W. Guilmartin*
Cullen W. Guilmartin (*Pro Hac Vice*)
GORDON & REES LLP
95 Glastonbury Blvd., Ste. 206
Glastonbury, CT 06033
Tel: (860) 494-7513
Fax: (860) 560-0185
Email: cguilmartin@grsm.com

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND INFORMATION ......................................................................2

    a.      Case Overview ...........................................................................................2

    b.      Background of CSST ..................................................................................4

    c.      The Integrity Experts' Report ....................................................................6

    d.      The Integrity Experts' Testimonies .........................................................10

        i.      Background Regarding Integrity Experts ................................10

            a.      Expert Colwell .............................................................10

            b.      Expert Spruiell .............................................................10

            c.      Expert Hergenrether......................................................11

        ii.     Testimony Regarding Susceptibility of Bonded CSST ...........12

        iii.    Testimony Regarding Lightning Causing or Creating Hole ....13

        iv.     Testimony Regarding Ignition .................................................15

        v.      Testimony Regarding Omega Flex D&I Guide .........................18

III.    LEGAL STANDARDS ........................................................................................21

    a.      Federal Rule of Civil Procedure 26 .........................................................21

    b.      Federal Rule of Evidence 702 and Daubert ............................................22

IV.     LEGAL ARGUMENT..........................................................................................26

    a.      Integrity Experts Cannot Render the Opinion that the Benoit Fire Would Still Have Occurred if the CSST was Bonded...............................................26

    b.      Integrity Experts Cannot Render the Opinion or Offer Testimony that the Hole in the CSST at the Benoit Home was Caused By Lightning. ...................................28

    c.      Integrity Experts Cannot Render the Opinion or Offer Testimony that, if an Arc Occurred, it Resulted in Sustained Ignition in this Instance.................................31

    d.      The Integrity Experts, specifically Mr. Colwell, are not qualified to render the opinion that certain warnings or instructions within the Omega Flex D&I guide are confusing, nor will it assist the trier of fact....................................................38

V.      CONCLUSION......................................................................................................41

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

Atlantic Specialty Ins. Co. v. Porter, Inc.,
  2016 WL 6569346 (E.D. LA. Nov. 4, 2016) .................................................. 26, 29, 32, 33, 37

Barrett v. Atl. Richfield Co.,
  95 F.3d 375 (5th Cir.1996) ......................................................................................... 23, 39

Brainard v. Am. Skandia Life Assur. Corp.,
  432 F.3d 655 (6th Cir.2005) .............................................................................................. 22

Daubert v. Merrell Dow Pharms., Inc.,
  509 U.S. 579 (1993)................................... 1, 22, 24, 25, 26, 27, 29, 31, 35, 37, 38, 41

De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.,
  2015 U.S. Dist. LEXIS 182435 (N.D. Tex. Jan. 21, 2015) .................................... 26, 27, 29, 38

DePaepe v. General Motors Corp.,
  141 F.3d 715 (7th Cir. 1998) ....................................................................................... 29, 32

Diggs v. Citigroup, Inc.,
  551 F. App'x 762 (5th Cir. 2014)................................................................................. 25, 27, 32, 37

Garcia v. BRK Brands, Inc.,
  266 F. Supp.2d 566 (S.D. Tex. May 27, 2003)............................... 24, 25, 27, 28, 31, 32, 36, 37

Gen. Elec. Co. v. Joiner,
  522 U.S. 136 (1997)......................................................................................................... 26, 29

Gopalratnam v. Hewlett-Packard Co.,
  2017 U.S. Dist. LEXIS 40386 (E.D. Wis. Mar. 21, 2017) ......................... 33, 34, 35, 36, 40, 41

Guile v. United States,
  422 F.3d 221 (5th Cir. 2005) ......................................................................................... 25, 37, 38

Hathaway v. Bazany,
  507 F.3d 312 (5th Cir. 2007) ......................................................................................... 22, 24, 29

Hilt v. F.F.C., Inc.,
  170 F.R.D. 182 (D. Kan. 1997) ....................................................................................... 21

Honey-Love v. United States,
  664 Fed. Appx. 358 (5th Cir. 2016)................................................................................ 21

In re Pool Prods. Distribution Mkt. Antitrust Litig.,
  166 F. Supp. 3d 654 (E.D. La. 2016)............................. 22, 23, 24, 25, 26, 31, 32, 36, 37, 38, 40

Johnson v. Arkema, Inc.,
  685 F.3d 452 (5th Cir. 2012) ......................................................................................... 24

Knight v. Kirby Inland Marine Inc.,
    482 F.3d 347 (5th Cir. 2007) ................................................................. 23, 24, 26, 40

Kumho Tire Co. v. Carmichael,
    526 U.S. 137 (1999) .......................................................................................... 25

Leblanc v. Chevron USA, Inc.,
    396 F. App'x 94 (5th Cir. 2010).................................................. 23, 26, 28, 29, 40

McCune v. Graco Children's Prods., Inc.,
    495 F. App'x 535 (5th Cir. 2012)............................................................ 25, 33, 37

McGowan v. Cooper Indus., Inc.,
    863 F.2d 1266 (6th Cir.1987) ............................................................................. 31

Mid-State Fertilizer Co. v. Exch. Nat'l Bank,
    877 F.2d 1333 (7th Cir. 1989) ............................................................................ 22

Moore v. Ashland Chem., Inc.,
    151 F.3d 269 (5th Cir. 1998) ........................................................ 23, 24, 26, 28, 40

Payne v. Brayton,
    2017 U.S. Dist. LEXIS 6602 (E.D. Tex. Jan 18, 2017) ....................................... 21

Paz v. Brush Engineered Materials, Inc.,
    555 F.3d 383 (5th Cir. 2009) .............................................................................. 24

Pride v. BIC Corp.,
    218 F.3d 566 (6th Cir. 2000) ........................................................................ 25, 26

R.C. Olmstead, Inc. v. CU Interface, LLC,
    657 F. Supp. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir. 2010) ........ 21, 35

Redman v. John D. Brush & Co.,
    111 F.3d 1174 (4th Cir.1997) ....................................................................... 23, 39

Salgado by Salgado v. Gen. Motors Corp.,
    150 F.3d 735 (7th Cir. 1998) ....................................................................... 21, 35

Tamraz v. Lincoln Elec. Co.,
    620 F.3d 665 (6th Cir. 2010) .................................................................. 23, 28, 40

United States v. Cooks,
    589 F.3d 173 (5th Cir. 2009) .............................................................................. 22

United States v. Langan,
    263 F.3d 613 (6th Cir. 2001) .............................................................................. 31

Watkins v. Telsmith, Inc.,
    121 F.2d 984 (5th Cir. 1980) ........................................................................ 23, 26

Wells v. Smithkline Beecham Corp.,
    601 F.3d 375 (5th Cir. 2010) ........................................................ 23, 24, 28, 40

**Rules**

Federal Rule of Evidence 702 .................................................................... 1, 22, 23, 25, 31, 38, 41

Federal Rules of Civil Procedure 26 ................................................................ 1, 21, 34, 35, 36, 41

**Regulations**

4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000) .................................................. 23, 38, 39

National Fuel Gas Code, ANSI Z223.1–2012 (NFPA 54–2012) §§ 5.6.3.4, 7.2.7, 7.3.2, 7.13.2, passim (2012 ed.) ..................................................................................................................... 6

National Fuel Gas Code, ANSI Z223.1–2015 (NFPA 54–2015) §§ 5.6.3.4, 7.2.6, 7.3.2, 7.13.2, passim (2015 ed.) ..................................................................................................................... 6

# I.    __INTRODUCTION__

Pursuant to Federal Rules of Civil Procedure 26 and Federal Rule of Evidence 702, the Defendant Omega Flex, Inc. ("Omega Flex"), hereby submits this Memorandum of Law in Support of its Motion to Exclude Certain Opinions and Testimony of Plaintiff's Experts, Mark Hergenrether ("Mr. Hergenrether"), John Spruiell ("Mr. Spruiell"), and Kelly Colwell ("Mr. Colwell") (collectively "Integrity experts").[1]    The Integrity experts prepared a joint report outlining the opinions that they will offer at trial.    Omega Flex herein seeks to preclude the Integrity experts from offering certain opinions contained in the joint report and accompanying testimony that do not meet the requirements for expert opinion as espoused in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and its progeny.    Specifically, the Integrity experts should be excluded from testifying regarding the following opinions included in their July 28, 2017, report (attached hereto as **Exhibit A**):

1.  The fire at issue would still have occurred if the CSST was bonded;

2.  The hole in the CSST was caused by lightning;

3.  If an electrical arc occurred, it resulted in the  ignition of gas escaping the CSST; and

4.  The applicable Omega Flex Design Guide and Installation Instruction ("D&I Guide") is ambiguous or confusing.

As detailed herein, the Integrity experts cannot reliably render an opinion or testimony that the subject fire would have occurred even if the CSST was bonded, as the Integrity experts took no steps to apply this methodology/test to this action.    Furthermore, the Integrity experts

---

[1] Please note the Integrity experts (e.g. Mr. Colwell, Mr. Hergenrether, and Mr. Spruiell) co-authored one report, which contains a compilation of their individual opinions.  See C. Colwell's Depo., dated September 21, 2017, at p. 10, attached hereto as **Exhibit B** (noting that the report was prepared by him and two others, and that not all of the opinions within the one report are his); J. Spruiell Depo., dated September 21, 2017, at p. 20, attached hereto as **Exhibit C** (agreeing that the report contains the opinions of the Integrity experts, and that only certain opinions are his); and M. Hergenrether Depo., dated September 21, 2017, at pp. 14-15, attached hereto as **Exhibit D** (stating that the report is a joint report, and contains some opinions that are outside of his expertise).

cannot render an opinion or testimony that the hole in the CSST was caused by lightning because this opinion is based on a non-existent (and unrecognized) methodology. Moreover, the Integrity experts cannot reliably render an opinion that in the event an arc occurred, it resulted in sustained ignition of escaping gas, as this opinion is based solely on their assumption that an object or opposing electrode was close enough to the CSST and within the path of the alleged gas jet, rather than based on actual evidence. Finally, the Integrity experts are not qualified to render the opinion that the D&I Guide is ambiguous, and, furthermore, the opinion is of no use to the trier of fact as the Integrity experts have no facts or information surrounding the installation of the CSST and/or the qualifications or mindset of the installer in this case.

## II.    BACKGROUND INFORMATION

### a.    Case Overview

This is a subrogation matter initiated by USAA General Indemnity Company, (hereinafter "USAA") *a/s/o* Claude Benoit (hereinafter "Mr. Benoit" or the "Insured") in order to recover from losses involving a June 24, 2015 house fire at Mr. Benoit's home located in Dedham Springs, Louisiana. Compl. at ¶¶ 6-7. USAA alleges that Omega Flex manufactured TracPipe Corrugated Stainless Steel Tubing ("CSST" or "TracPipe") which allegedly failed as a result of a lightning strike. USAA further alleges that this failure resulted in natural gas escaping the CSST, subsequently igniting, sustaining ignition, and causing the subject fire at Mr. Benoit's home. USAA's Amended Complaint contains one (1) count, sounding in negligence, failure to warn, and breach of the implied warranty of merchantability.

More specifically, USAA alleges that the "investigation into the origin and cause of the fire [of June 24, 2015] revealed that the corrugated stainless steel tubing (commonly referred to as "CSST") was located in the area where the fire started. The CSST was marked with the brand name "TracPipe," had a model number of DGP-334-500 and was designed, manufactured, and

sold by Omega Flex Incorporated.  A hole was discovered along the length of the CSST in the area where the fire started.  The hole … was created by the electrical energy imparted on the CSST after lightning struck the house immediately before the fire.  The electrical energy passed or arced across the ridges of the CSST, which punctured the CSST's thin wall.  Once the CSST's wall was compromised, natural gas began leaking into the attic.  Eventually the gas was ignited by a competent ignition source..."  Compl. at ¶¶ 8-10.  USAA further alleges that fire, which started in the attic, destroyed Mr. Benoit's home.  Compl. at ¶ 7.  While it is uncontroverted that a hole was found in the CSST, the parties dispute whether the hole was a cause of the fire or was a victim of the fire.

In order to support its purported theories of liability, USAA will need to prove that sufficient energy from the lightning strike made its way into Mr. Benoit's home to result in electrical arcing and perforation of unbonded CSST, that natural gas leaving the CSST ignited, that the ignition was sustained, and that the natural gas escaping the CSST was the first fuel ignited.  In short, USAA will need to establish causation.  In addition, with respect to its warranty claim, USAA will need to prove that the utility of Omega Flex's CSST is outweighed by its alleged risk; namely, CSST's alleged susceptibility to perforation resulting from a lightning strike.

Omega Flex will dispute each of these assertions.  In particular, Omega Flex avers that Mr. Benoit's home unquestionably was struck by lightning and that the cause of the subject fire was lightning, not a purported failure of the CSST.  Omega Flex will also set forth scientific evidence that the hole found in the CSST was too large to have been caused by any reported lightning strike reported near the home on the night in question (i.e. the CSST was a victim of the fire). Omega Flex will further proffer that the natural gas leaving the CSST could *not* have

3

been ignited by an electrical arcing event and therefore gas leaving the CSST was *not* the first fuel ignited.  Moreover, Omega Flex will offer substantial evidence in support of its position that the utility of its TracPipe CSST greatly outweighs any perceived risk of the product.  Moreover, Omega Flex will offer evidence that the CSST was not properly installed at the Benoit home as it was not properly bonded.  In summary, Omega Flex's position is that its CSST did not cause the fire at Mr. Benoit's home and that its CSST is not defective pursuant to Louisiana law and that its CSST was not properly installed.

Not surprisingly, much of the debate relating to these factual and legal disputes involves competing opinions of the parties' respective experts.  Three (3) of the Plaintiff's experts (who authored one shared opinion) regarding susceptibility of bonded CSST, ignition, and warnings, are the Integrity experts whose opinions are the subject of the instant Motion.

**b.**    **Background of CSST**

Before discussing the Integrity experts' joint report and testimony in detail, a discussion of the underlying product, CSST will hopefully provided this Court with additional context regarding the issues in dispute.[2]  TracPipe is a brand of CSST and is commonly used in residences to distribute fuel gas (either natural gas or propane) throughout the structure. CSST is often used either in conjunction with or in place of traditional black iron pipe. Black iron pipe, unlike CSST, must be installed in straight rigid lengths connected by multiple threaded fittings to change directions as the pipe is routed through walls, ceilings, and crawlspaces.

Since CSST is flexible, its installation only requires fittings at junctions and at connections to appliances.  Thus the installation of CSST requires many fewer fittings than the installation of black iron pipe for a similar household configuration. This makes a CSST system

---

[2] The information contained in this introductory paragraph is largely taken from the report of Timothy L. Morse, Ph.D. at Appendix B. This report, including the appendices, is attached as **Exhibit E**. Relevant citations are included in Appendix B.

less expensive to install than a black iron pipe system, and less prone to leaks. Gas leaks can occur at a fitting due to the fitting not being properly tightened, or to the fitting loosening over time, and are a common safety hazard in homes with gas service. CSST reduces the risk of gas leaks (due to the reduced number of fittings) and thus is a safer alternative than black iron pipe. CSST also provides additional safety over black iron pipe in resisting damage from acts of nature, such as earthquakes, tornadoes, landslides, floods and hurricanes. Any event that causes a shift in the house foundation and/or structure may cause relative movement of two ends of a gas line. If that gas line is CSST, the inherent flexibility of CSST can accommodate.

CSST products, including TracPipe, are listed by Underwriters' Laboratories (UL) and have been independently tested and found to be suitable for the distribution of fuel gas within a structure in accordance with ANSI LC-1/CSA 6.26 Fuel Gas Piping Systems Using Corrugated Stainless Steel Tubing (CSST). In addition, CSST is required to be installed only by a qualified installer who has passed the manufacturer's certification/training program.

The alleged attendant risk of CSST is that it is allegedly more susceptible to perforation from an electrical arcing event than black iron pipe resulting from a lightning strike/event. This is allegedly the result of its thinner walls than black iron pipe which are necessary for the product's flexibility; an attribute with many benefits as discussed above. However, to combat the purported risk due to lightning, CSST manufacturers, including Omega Flex, require that its product be bonded to the building's grounding electrode (which it was NOT at the Benoit home). The National Fuel Gas Code, a model code cosponsored by the American Gas Association and the National Fire Protection Association, also permits the installation of CSST with bonding and grounding to mitigate lightning risk. See National Fuel Gas Code, ANSI Z223.1–2015 (NFPA

54–2015) §§ 5.6.3.4, 7.2.6, 7.3.2, 7.13.2, passim (2015 ed; National Fuel Gas Code, ANSI Z223.1–2012 (NFPA 54–2012) §§ 5.6.3.4, 7.2.7, 7.3.2, 7.13.2, passim (2012 ed).

c.    **The Integrity Experts' Report**

The Integrity experts have been disclosed by USAA as experts regarding, among many other things, the effect, if any, bonding would have had on the cause of the fire, the ability of the product to ignite after the alleged failure of the CSST, and warnings/instructions provided within Omega Flex's D&I guide.  These opinions are contained in a joint report, dated July 28, 2017 (Exhibit A).[3]  The report first provides a bulleted list of their combined summarized opinions, along with approximately four (4) pages of their "bases of opinions."

The Integrity experts' report provides the following eight bullet points summarizing their conclusions and/or opinions:[4]

[1.]    The arc hole, identified as "3A", in the TracPipe® CSST natural gas line to the living room fireplace occurred when lightning struck the Benoit home on the evening of June 24th, 2015.

[2.]    The fire in the Benoit home was caused when this arc hole (3A) in the TracPipe® CSST gas piping was created. Natural gas within this gas piping escaped and was ignited during the arc event. This resulted in a fuel-gas-fed fire.

[3.]    The TracPipe® CSST used to distribute natural gas throughout the Benoit home failed to contain the fuel gas as a result of the arc hole created by the lightning strike.

[4.]    The amount of charge that created arc hole (3A) in the TracPipe® CSST line would not have been sufficient to cause a failure of rigid black iron gas pipe.

[5.]    The gas piping system was bonded to the home's grounding electrode system in accordance with the 2005 National Electrical Code and the 2006 National Fuel Gas Code.

---

[3] Of note, the report was not subject to a peer review, beyond the three (3) Integrity experts reviewing the final report.  Exhibit B at pp. 38-39.

[4] For the purposes of this Motion, the bullet points have been changed to numbers.

[6.]    The "bonding" as described in Item #2 and depicted in Figure 4-21 of Section 4.10 "Electrical Bonding/Grounding" in the OmegaFlex Design and Installation Instructions was not a requirement of the 2005 National Electrical Code.

[7.]    The National Electrical Code is not intended to serve as a standard for lightning protection. The National Electrical Code is intended to protect persons and property from hazards arising from the use of electricity.

[8.]    In testing CSST gas piping, bonded in the manner depicted and described in Section 4.10 and Figure 4-21 of the OmegaFlex Design and Installation Instructions, we subjected the CSST to electrical impulse currents at voltages below that of a typical lightning strike. We found an arc can still occur between the CSST gas piping and another grounded/bonded conductive component. The described arc event can result in a perforation from which the natural gas can escape from the gas piping. The characteristics of the hole created in our testing are consistent with the hole "3A" observed in this matter as well as those in the many other CSST-related fire losses this firm has investigated.

Exhibit A at p. 2. Moreover, the report notes that "[t]hese opinions are based on the data collected, the data analyzed, and [their] testing of hypotheses as described in NFPA 921 [Guide for Fire and Explosion investigations]."[5] Id. The report goes on to identify the "bases for these opinions," including a description of the circumstances surrounding the cause and origin investigation (performed by the cause and origin expert disclosed by plaintiff), and the multi-party scene inspection, as well as lab examinations. See generally, Exhibit A.

After summarizing, in general terms, their conclusions relating to the susceptibility of bonded CSST (bullet point 8), the Integrity experts describe the experiments or tests on bonded CSST gas piping in general, as well as Omega Flex TracPipe as follows:

200uF capacitors were charged to 17,000 volts and discharged onto the CSST gas pipe in contact with a grounded conductor, consistent with residential wiring and terminated at the same ground bus as the heavy gauge bonding wire. Both the outer sheathing of the CSST and the type NM cable were pin-pricked to

[5] When asked why the report cites to the NFPA 921, Mr. Colwell testified that it they felt it was "important to do so" "in a manner that's accepted by fire investigators" whom they were assisting, since they "believe[d] they're relying upon" the report as well. Exhibit B at p. 39.

> discharge. [They] found that … arcing occur[ed] [and] produc[ed] perforations in the gas piping … These perforations occurred at numerous distances along the length of gas piping … The characteristics of the holes created in [their] testing are consistent with hole 3A in this matter…

Exhibit A at p. 8 (emphasis added).

Further more, the Integrity report notes that typically "[t]he 50th percentile, single flash of lightning transfers about 15 coulombs of charge," and they "estimate[d] that an arc transferring 7 to 10 coulombs of charge created the hole found in the Benoit CSST." Exhibit A at p. 8 (second paragraph). The report does not provide any indication or details regarding their calculation or how they arrived at this estimate, beyond assuming the median figure of 15 coulombs. See id.

The Integrity report also describes another examination or test, referred to as "low-level, lightning-simulation testing on the involved type of CSST," which relates to the Integrity Experts' conclusion(s) regarding ignition (bullet point 2). Exhibit A at p. 7. The testing involved an "electrode [an object] from which the arc was emitted – said electrode [was] positioned either 1/8-inch or 3/4-inch from the CSST – often was in the path of the gas jet." Exhibit A at p. 8. As a result of this testing, the Integrity experts found:

> that almost always, the arc which created the hole caused ignition of the gas escaping from the hole. **Sometimes, however, the burning gas jet blew out and extinguished *unless* an object was in the path of the jet.**

Exhibit A at p. 8 (emphasis added). The report does not provide any additional details or specifics regarding this lab examination, namely when this examination occurred, who performed this examination, and/or details regarding how often sustained ignition did not occur with or without an object or electrode. Id. Moreover, there is no discussion or application of this examination to the facts of the Benoit home. Id. Furthermore, with respect to the multi-scene inspection, the report notes that the "electrical device closest to" the hole found in the TracPipe® CSST line "was a 6" recessed light fixture located in the southeast corner. There was no

evidence of a failure in this recessed light fixture.  However, the mounting bracket and housing were too badly damaged to find any evidence that the light[n]ing current arced off the CSST to this fixture."  Exhibit A at p. 6.  There is no further discussion of this light fixture and its proximity to the CSST, nor does the report offer the opinion that this light fixture could have been an object or opposing electrode within the path of the alleged gas jet necessary for sustained ignition.  See generally, Exhibit A.

Additionally, in connection, with their opinions relating to the D&I guide (bullet points 5-7), the Integrity experts looked at one provision, specifically Section 4.10, which pertains to specific "Electrical Bonding/Grounding" instructions for Omega Flex products.[6]  Id. at p. 7.  The Integrity experts focus on the last sentence of the provision, which states, "[t]he bonding requirement is a requirement of the National Electrical Code."  Id.  The Integrity experts note that this statement is incorrect, and further attempt to frame the D&I guide as ambiguous or confusing, simply because Section 4.10 requires additional bonding, involving a "heavy gauge bonding wire and a bonding clam," in excess or outside of the bonding required by the National Electrical Code.  Id. at p. 7.  The report provides absolutely no guidance or explanation as to why a manufacturer is confined to the requirements of the National Electrical Code, nor does the report provide any comments or opinions regarding the actual bonding instructions contained

---

[6] Section 4.10 of the D&I guide states as follows:

> For bonding of the TracPipe® system, a bonding clamp must be attached to the brass AutoFlare® fitting adapter (adjacent to the pipe thread area – see Figure 4.21) or to a black pipe component (pipe or fitting) located in the same electrically continuous gas piping system as the AutoFlare® fitting.  The corrugated stainless-steel portion of the gas piping system SHALL NOT be used as the bonding attachment point under any circumstances.  Bonding electrode conductor sizing shall be in accordance with Article 250 (Table 250-66) of ANSI/NFPA70.  **The bonding requirement is a requirement of the National Electrical Code.**

Exhibit A at p. 7 citing 2007 Omega Flex D&I Guide, at p. 151 (emphasis added).

within Section 4.10.  See generally, Exhibit A.  There is no further discussion regarding their opinions or basis for the D&I guide.

### d.    The Integrity Experts' Testimonies

The three (3) Integrity experts were deposed on September 21, 2017, and a condensed version of their transcripts are attached hereto as **Exhibit B** (Colwell Transcript), **Exhibit C** (Spruiell Transcript) and **Exhibit D** (Hergenrether Transcript).

### i.    *Background Regarding Integrity Experts*

### a.    Expert Colwell

Mr. Colwell testified regarding his background and offered further guidance regarding his opinions within the Integrity experts' report.  Mr. Colwell's background is as an electrician.  See Exhibit A at p. 9.  Mr. Colwell is not a certified fire investigator ("CFI") or a certified fire and explosion investigator ("CFEI").  Exhibit B at p. 20.  He has never installed CSST in a residence, has not overseen the installation of CSST in a residence, and is not a metallurgist.  Exhibit B at p. 21.  Furthermore, Mr. Colwell is not a warnings expert or an expert in writing instructions for products, does not have any degrees or experience with human factors analysis, and has never written a warning for any product.  Exhibit B at pp. 55-56, 62.  Mr. Colwell also agreed (that with the exception of rebutting Omega Flex's expert opinions) the Integrity Report (Exhibit A) contains the entirety of the opinions he is going to offer.  Exhibit B at p. 5.  Specifically, Mr. Colwell testified that he would only offer testimony regarding certain opinions within the Integrity report, namely bullets one and two, and bullets five through eight.  See Exhibit A at p. 2; Exhibit B at pp. 23-25.

### b.    Expert Spruiell

Mr. Spruiell testified regarding his background and offered further guidance regarding his opinions within the Integrity experts' report.  Mr. Spruiell's background is as a mechanical

engineer.  Exhibit C at p. 19.  He is not a CFI or a CFEI.  Exhibit C at p. 18.  Moreover, Mr. Spruiell is not licensed to install gas piping or certified to install CSST, has never installed CSST, and is not a metallurgist.  Exhibit C at p. 19.  Mr. Spruiell also agreed (that with the exception of rebutting Omega Flex's expert opinions) the Integrity Report (Exhibit A) contains the entirety of the opinions he is going to offer.  Exhibit C at pp. 14-16.  In particular, Mr. Spruiell testified that he would only testify regarding certain opinions in the Integrity report, specifically bullet points one through four and bullet point eight.  Exhibit A at p. 2; Exhibit C at p. 20.

### c.    Expert Hergenrether

Likewise, Mr. Hergenrether testified regarding his background and offers further guidance as to his opinions contained within the Integrity experts' report.  Mr. Hergenrether's background is as a professional engineer.  <u>See</u> Exhibit A at p. 10.  Mr. Hergenrether is not a CFI; however, he is a CFEI (as of 2009).  Exhibit D at pp. 24-25.  He has never installed or overseen the installation of CSST, nor is he licensed to install gas piping, and is not a metallurgist.  Exhibit D at p. 25-26.  Mr. Hergenrether agreed (that with the exception of rebutting Omega Flex's expert opinions) the Integrity Report (Exhibit A) contains the entirety of the opinions he is going to offer in this case.  Exhibit D at pp. 14-15.  Specifically, Mr. Hergenrether testified that he would only testify regarding certain opinions in the Integrity report; bullet points one through three.[7]  Exhibit A at p. 2; Exhibit D at pp. 30-32.

---

[7] Despite, Mr. Hergenrether's testimony regarding his opinions relating to bullet points one through three, when asked to expand or explain those opinions, Mr. Hergenrether often deferred to the other Integrity experts.  <u>See</u> Exhibit D at pp. 41-46, 55.

ii.       *Testimony Regarding Susceptibility of Bonded CSST*

The Integrity experts, primarily Mr. Colwell (and to an extent Mr. Spruiell), were examined regarding their opinion and/or testimony relating to the susceptibility of bonded CSST, specifically that the Benoit fire would have occurred even if the CSST was bonded.[8]  See Exhibit A at p. 8 (third paragraph); Exhibit C at pp. 50-51.  During their depositions it became evident that this opinion is dubious at best, given Integrity's failure to apply this test to the facts involved in this action.

As discussed *supra*, in connection with this opinion, the Integrity experts performed testing where they pin-pricked the outer sheathing of the CSST and cable before discharging 17,000 volts onto the CSST gas pipe with a bond approximately twenty-four and a half feet or more away from the pin-pricks.  See Exhibit A at p. 8; Exhibit B at p. 75; 80.  During his deposition, Mr. Colwell testified that it was possible that the risk of perforation with bonded CSST is less then with an unbonded CSST.  Exhibit B at p. 82.  However, despite this acknowledgement, when asked as to whether Integrity performed any tests to support the opinion that the hole in the Benoit CSST would have occurred *had the home been bonded* in accordance with the applicable D&I Guide, Mr. Colwell acknowledged that their testing had been different and/or "more conservative" then the circumstances in this instance.  Exhibit B at pp. 83-84.  Mr. Colwell further admitted that, "the testing that was done and produced … was more of a generalized test, not specifically for the Benoit matter…" Exhibit B at p. 81-82.  Rather, the testing that was done relates more to "what we see most of the time in our [other] cases…" Exhibit B at p. 83.  In sum, there is nothing within the testimonies of the Integrity experts, which

---

[8] Mr. Spruiell testified that he was only "peripherally associated with [the related testing]," and instead it was more Mr. Colwell and Mr. Hergenrether's.  Exhibit C at pp. 50-51.  **Subsequently, Mr. Spruiell testified that he does not intend to offer the opinion that even if the CSST at the Benoit home had been bonded there still would have been a hole**.  Exhibit C at p. 52.

demonstrates that Integrity took any steps to apply their testing to the Benoit incident.  Exhibit B at pp. 75-77, 81-83.

### iii.    Testimony Regarding Lightning Causing or Creating Hole

The Integrity experts, specifically Mr. Spruiell, were examined regarding their opinion and/or testimony that the hole in the CSST was caused by lightning.  During their depositions it became clear that this opinion lacks foundation and instead rests on Mr. Spruiell's assumptions, rather then any recognized calculations and/or methodology(s).  In particular, Mr. Spruiell testified that he is of the opinion that the hole in CSST occurred when lightning struck the Benoit home.  Exhibit C at p. 20.  When asked what Mr. Spruiell did to verify that a lightning strike in the vicinity of the Benoit home had the capability of transferring seven to ten coulombs of charge, Mr. Spruiell responded that it was his "understanding [that] there were several strikes that would have had the Benoit home in close proximity.  And you can't take – well, you can, but it's brought with difficulty in terms of accuracy … But [he] kn[e]w that the average flash has about 15 coulombs.  And by average [he] mean[t] actually the median, where half [would] be more intense than 15 and half [would] be less intense than 15."  Exhibit C at pp. 35-36. However, when pressed as to what Mr. Spruiell did to confirm that any of the lightning strikes in the vicinity of the Benoit home could have been at or greater than the 50th percentile single flash of lightning, e.g. 15 coulombs of charge, Mr. Spruiell provided the following colloquy:

> **I did not confirm it.**  It stands to reason that most of them are going to be – if you have several, then there's **a pretty good chance that at least one of them is going to be more than 15 [coulombs].**

Exhibit B at pp. 36-37 (emphasis added).  Instead, Mr. Spruiell admitted he was using the median (15 coulombs) to calculate the lightning transfer.  Exhibit C at pp. 37-38.

Notably, when asked if he performed an analysis or looked at the kilo-amps of the lightning strikes in vicinity to the Benoit home, Mr. Spruiell testified that "[he] did not" despite

that "[he] [has] performed [such an analysis] in other cases" although the results would be dictated by the waveform chosen. Exhibit B at p. 37. Indeed, Mr. Spruiell admitted that there were calculations that he could have performed to calculate a median wave form that would develop from a lightning strike in the vicinity of the Benoit home. Exhibit C at p. 39. In fact, Mr. Spruiell testified that he has performed such calculations in other cases he is involved in. Exhibit C at p. 39. Specifically, Mr. Spruiell testified that, "there is a calculation routine, that [he] could [have done] … to predict how many coulombs there are in a flash given the peak kilo-amps." Exhibit C at p. 39. However, he did not conduct that test here, presumably because it would disprove plaintiff's liability theory as there was no lightning discharge in the vicinity of the Benoit home that could have caused seven to ten coulombs of charge to pass through the CSST.

Moreover, when asked if he could have looked at any physical evidence to verify the coulombs, Mr. Spruiell testified "[i]t might be possible to have a look at the chimney cap and see what size holes and what amount of damage it has and … confirm it that way;" however, [he had] not given that any thought though." Exhibit C at p. 40. Of note, Mr. Spruiell did not inspect or examine the chimney cap from the Benoit home. Exhibit C at p. 22. When pressed as to whether Mr. Spruiell could have used the "Hagenguth calculation" to calculate the coulombs of charge that would have caused the damage on the chimney cap, Mr. Spruiell acknowledged that "you might, but [he did not] know what the cap look[ed] like … [but] [i]f [there was] one hole, then, yes, [you could perform that calculation]. So that would be a little research project to -- to try and do that with the chimney cap. Frankly, I hadn't considered that before." Exhibit C at pp. 40-41. See also Exhibit C at pp. 42-43 (testifying that the Hagenguth calculation was "generally accepted").

### iv.   *Testimony Regarding Ignition*

In addition to the above testimony, the Integrity experts were examined regarding other laboratory testing or simulations addressed in their report, including the testing relating to ignition and/or sustained ignition.  See Exhibit A at p. 8 (first paragraph).  Of note, the Integrity experts testified that their testing was not conducted in connection with the case at hand, but rather in connection with a paper authored by the Integrity experts in or about 2013.  Exhibit A at pp. 7-8; Exhibit C at pp. 11-12 (agreeing that the testing described was related to their paper); Exhibit D at pp. 42-44 (noting the testing was conducted years before this loss in connection with a paper authored by Integrity and was not specific to this case).  Mr. Spruiell testified that the paper and simulation (referred to in their report) specifically related to whether an arc, which creates a hole in a CSST line, can also ignite escaping gas at the time of the "discharge event." Exhibit C at p. 11.  Moreover, Mr. Spruiell admitted the test did not take into account any of the facts specific to the incident at the Benoit home.  See Exhibit C at pp. 34-35.

As noted in their report (Exhibit A), the Integrity experts "found that almost always the arc which created the hole caused ignition of the gas escaping from the hole.  ***Sometimes, however, the burning gas blew out and extinguished unless an object was in the path of the jet.***" Exhibit A at p. 8 (emphasis added).  During the depositions, the Integrity experts further explained that in order to obtain sustained ignition, something e.g. an object (opposing electrode) must be present to "take[] the gas and cause it to diffuse."  Exhibit B at p. 65.  As discussed *supra* and testified by the Integrity experts, their related testing involved an object placed at either one-eights or three-fourths of an inch away from the CSST and within the path of the gas jet.  Exhibit A at p. 8 (first paragraph); Exhibit C at pp. 29, 34.  When asked why Integrity stopped at those distances, Mr. Spruiell testified that, "[he didn't] know.  [He] wanted a small gap and a wider gap, and so [they] just selected those."  Exhibit C at p. 29.  In addition, Mr.

15

Spruiell admitted that they had a greater percentage of sustained ignitions when the electrode was moved closer to one-eighth of an inch away from the CSST.  Exhibit C at p. 33.  Notably, Mr. Spruiell testified that about half of the tests (approximately sixteen (16) tests) were performed with an object or opposing electrode three-fourths of an inch from the CSST, and of those sixteen (16) tests approximately eight (8) tests were performed with a jacketed CSST. Exhibit C at pp. 31-33.  Of those tests (with the jacket CSST), Mr. Spruiell testified that they ***"only had the sustained flame in two out eight [tests]."***  Exhibit C at p. 33 (emphasis added).  In this regard, in order to get even a potential for sustained ignition – and thus a cause of the fire in this case – Integrity needs to place an object between the CSST and the opposing electrode (or the opposing electrode) less than one inch from the CSST to even have chance of sustained ignition.

During the depositions of the Integrity experts, particularly Mr. Colwell,[9] it became clear that any testimony offered relating to the presence of such an object (or opposing electrode) within the path of the alleged gas jet at the Benoit home rests purely on the assumption that a recessed light fixture (otherwise referred to as a can light) or some other unidentified material within the Benoit home was close enough (specifically within at most three-fourths of an inch) to the CSST.[10]  See Exhibit B at pp. 53, 65; Exhibit C at pp. 30-31 (admitting he believed the can light was the opposing electrode; however, he would defer to Colwell and Hergenrether, as he

---

[9] See Exhibit B at p. 65 (noting that Mr. Spruiell "is going to better cover this [topic]"); Exhibit C at pp. 30-31 (Mr. Spruiell noting that "[was] all Colwell and Hergenrether's work"); Exhibit D at pp. 41-46, 55 (Mr. Hergenrether continually deferred to Mr. Colwell and Mr. Spruiell when questioned regarding this opinion; but offered his own assessment that it was "close" but had no knowledge as to where the light was in proximity to the CSST line).

[10] Notably, despite the can light being mentioned in the report, this theory was not identified or discussed.  See generally, Exhibit A.  Nor was the can light identified as a possible object (or opposing electrode) or even mentioned in the context of the related examination in the Integrity report.  See Exhibit A at pp. 6, 8.  Indeed, Mr. Colwell testified that to the extent he addressed this issue he would have addressed it in the one paragraph on page 6 of the report relating to the electrical devices closet.  See Exhibit A at p. 6 (last paragraph); Exhibit B at pp. 70-71.  Again, that particular paragraph (and the remaining paragraphs of the report) fails to identify any such object or discuss this theory.  See generally, Exhibit A.

did not have any knowledge as to how close the light actually was); Exhibit D at p. 55 (stating it was "probable that [the object] was the can light;" however, he had no knowledge regarding the distance between the CSST and the can light, nor could he actually identify the specific object that was in the path of the alleged gas jet.

Mr. Colwell testified, however, that it was "*probable*" that "*something*" was in close proximity to the hole and "*could have caused* the gas to diffuse and sustain ignition." Exhibit B at p. 66. However, when asked how close the recessed light was to the CSST, Mr. Colwell responded, "I would say it's very close based off where the hole [in the CSST was]." Exhibit B at p. 51. Furthermore, when pressed as to how close the light was to the CSST, Mr. Colwell testified that he could not place it within six (6) inches of the CSST. Exhibit B at pp. 52-53 (noting the can light was "within a matter of few inches maybe, maybe closer, maybe a little bit more … I would not be able to tell you that its exactly six inches away from the CSST line"), 66. See also Exhibit C at pp. 30-31 (Spruiell admitting no knowledge as to how close the light was); Exhibit D at p. 55 (Hergenrether admitting he could not even place the light within feet of the CSST). Notably, although, Mr. Colwell testified that he believed it was "*probable"* that the light *could have been* close enough to the CSST in the Benoit home; he admitted that he could not actually identify which object, if any, was within an inch of the hole of the CSST. Exhibit B at pp 67-68.

Despite Mr. Colwell's testimony that it was probable or possible that the can light was close enough to the CSST to sustain ignition, it became clear during the depositions of the Integrity experts that no testing or analysis that applied the facts in this case had actually been done. In fact, when asked about this simulation or examination and what had been done to test the alleged circumstances in the Benoit home, Mr. Spruiell admitted that the test did not answer

whether a recessed light fixture at six (6) inches away would sustain ignition, rather the test looked at an object within the path of a gas jet and <u>at most</u> three-fourths of inch away from the CSST.  Exhibit C at pp. 29-30 (noting the testing was only performed with the object one-eighth of an inch and three-fourths of an inch away); 33-35.  <u>See</u> <u>also</u> Exhibit A at p. 8.  Mr. Spruiell further admitted that no testing was done specifically for this case and that the circumstances in the Benoit home were "different from the conditions of [their] test [for their paper]."  Exhibit C at p. 34-35.

### v.    *Testimony Regarding Omega Flex D&I Guide*

Of the three (3) Integrity experts, Mr. Colwell is the one expert that intends to offer testimony and/or opinions relating to the Omega Flex D&I guide, identified as bullet points 5-7 in the summary of the Integrity experts' conclusions.  <u>See</u> Exhibit A at p. 2; Exhibit C at p. 20 (identifying the opinions Mr. Spruiell was offering); Exhibit D at p. 30-31 (admitting Mr. Hergenrether was not going to offer any opinion regarding the 2007 D[&]I guide).

During his deposition, it became clear that Mr. Colwell's opinion regarding warnings and/or instructions within the D&I guide, in particular his opinion that "[t]he 'bonding' … depicted in Figure 4-21 of Section 4.10 'Electrical Bonding/Grounding' in the Omega Flex [D&I guide]" is confusing or ambiguous, is entirely based on his own assumptions and/or personal beliefs; rather then any scientific or recognized methodology.[11]  Exhibit A at p. 2; Exhibit B p. 61.  As discussed *supra*, Section 4.10 of the D&I guide states as follows:

> For bonding of the TracPipe® system, a bonding clamp *must be attached* to the brass AutoFlare® fitting adapter (adjacent to the pipe thread area – see Figure 4.21) or to a black pipe component (pipe or fitting) located in the same electrically continuous gas piping system as the AutoFlare® fitting.  The corrugated stainless-steel portion of the gas piping system SHALL NOT be used as the bonding attachment point under any circumstances.  Bonding electrode

---

[11] Again, although the report cites to NFPA 921, Mr. Colwell testified that this was more for the fire investigators who might rely on their report.  Exhibit B at p. 39.

> conductor sizing shall be in accordance with Article 250 (Table 250-66) of ANSI/NFPA70. The bonding requirement is a requirement of the National Electrical Code.

Exhibit A at p. 7 <u>citing</u> 2007 Omega Flex D&I Guide. Specifically, Mr. Colwell's opinion regarding Section 4.10 of the D&I guide is premised on his personal belief that the last sentence, stating that, "the bonding is a requirement of the National Electrical Code" is confusing because although bonding is required within the National Electrical Code, the particular bonding described in Section 4.10 is not. Exhibit B at pp. 56, 58-61. In short, Mr. Colwell testified that if he were handed these instructions, "[he] would read bond" and agree that bonding is a requirement of the National Electrical Code, just not in the terms described in Section 4.10. Exhibit B at pp. 58-59. Mr. Colwell further explained that "as an electrician" (not a plumber like the installer in this case) he found the D&I guide confusing because Section 4.10 provided "all these things up above [the statement noting bonding is required by the National Electrical Code]," namely additional bonding that went beyond the different bonding requirement contained within the National Electrical Code. Exhibit B at pp. 56 (noting he is not an expert in writing instructions, but his understanding/reading of the D&I guide is as "an electrician"); 59. Despite this opinion, however, Mr. Colwell admitted that manufacturers are not limited or confined to the National Electrical Code, and can in fact have requirements in excess or outside of the Code. Exhibit B at p. 57.

Furthermore, when pressed on the basis or methodology of this opinion, Mr. Colwell conceded that he could not provide something "from the standpoint of [a] scientific method" at that time. Exhibit B at p. 61. Instead, Mr. Colwell provided the following colloquy:

> I'm just telling you as an electrician reading it [if] a plumber asks me, hey, you need to bond the gas piping; … I understand [that] I need to bond the gas piping. And [I] [would] go off the [National Electrical] code; [rather then the D&I guide].

19

Exhibit B at p. 61.  This reasoning ignores not only the D&I guide in general, as well as the need to use the guide in connection with CSST installation, but also that Omega Flex (like many other manufacturers) requires installers be certified and receive the necessary training prior to installing their product.[12]  See id.; see also Exhibit B at p. 63 (acknowledging that he was aware Omega Flex requires certification or training in order to install TracPipe).   Admittedly, apart from his generic and unsupported opinion that this provision is ambiguous as a result of one sentence, Mr. Colwell has no knowledge regarding whether the installer in this case found the instructions to be confusing.  See Exhibit B at pp. 61, 63.  In fact, Mr. Colwell testified to the following:

> Q.     Do you have any idea as to whether or not [the installer] was confused by this section of the D[&]I guide?
>
> A.     I have not spoken to the installer in this case.
>
> Q.     And you have no idea, since you don't know this person, regarding the state of mind that [the] installer would have had when he read Section 4.10 of the D[&]I guide; is that right?
>
> A.     I have not spoken to the installer in this case.  I don't know that the installer even got the installation instructions … I mean it's kind of one of those again, as I'm [sitting] here as an electrician reading this, it is confusing …
>
> * * *
>
> Q.     Do you have any knowledge regarding the training of the installer of the CSST in the Benoit home?
>
> A.     No, I have not spoken to the installer of the CSST in the Benoit home.
>
> Q.     If I were to represent to you that the installer of the CSST at the Benoit home was not trained or certified by Omega Flex, that he wouldn't even have been given by Omega Flex a copy of the D[&]I guide --

---

[12] Although Mr. Colwell is not certified to install Omega Flex CSST, Mr. Colwell is clearly aware that manufacturers often require installers to be certified and trained specifically with their products, as he is a certified installer of another manufacturer's CSST product.  Exhibit B at pp. 20-21.

A.    I haven't spoken to the installer, nor do I know what he had.  I don't know if he was certified and I don't know what information he had.[13]

Exhibit B at pp. 61, 63.  Furthermore, when asked "why would Omega Flex have included … additional information regarding what 'must be attached' [in connection with installing and bonding the CSST]," Mr. Colwell responded (without any support) that it merely "encompasse[d] a lot of background."  Exhibit B at p. 59.

## III.    LEGAL STANDARDS

### a.    Federal Rule of Civil Procedure 26

Pursuant to the Federal Rules of Civil Procedure, expert reports must be "detailed and complete."  See Fed. R. Civ. P. 26 Advisory Committee's note (stating a complete report must include the substance of the testimony which an expert is expected to give together with the reasons therefor); see also Honey-Love v. United States, 664 Fed. Appx. 358, 361 (5th Cir. 2016).  Specifically, an expert report must contain "the data or other information considered… in forming" the conclusions or "any exhibits that will be used to summarize or support" the conclusion.  See Fed. R. Civ. P. 26(a)(2)(B)(ii)-(iii).  Further, "'an expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation.'" Payne v. Brayton, 2017 U.S. Dist. LEXIS 6602 at *6 (E.D. Tex. Jan 18, 2017) citing R.C. Olmstead, 606 F.3d at 271.  Specifically, "'[e]xpert reports must include 'how' and 'why' the expert reached a particular result, not merely the expert's conclusory opinions.'"  Salgado by Salgado v. Gen. Motors Corp., 150 F.3d 735, 742 n. 6 (7th Cir. 1998).  See also R.C. Olmstead, Inc. v. CU Interface, LLC, 657 F. Supp. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir. 2010) citing Hilt v. F.F.C., Inc., 170 F.R.D. 182, 185 (D. Kan. 1997) (stating "[a]n expert 'report must provide the substantive rationale in detail with respect to the basis

---

[13] Likewise, Mr. Hergenrether testified to the same.  Exhibit D at p. 28.

and reasons for the proffered opinions. It must explain factually why and how the witness has reached them'"). "[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process." Brainard, 432 F.3d 655, 664 (6th Cir. 2005) citing Mid-State Fertilizer Co. v. Exch. Nat'l Bank, 877 F.2d 1333, 1339 (7th Cir. 1989).

### b.    Federal Rule of Evidence 702 and Daubert

Federal Rule of Evidence 702 provides the standard governing a court's determination of whether to admit scientific or other expert testimony.  It allows opinion testimony from "a witness who is qualified as an expert by knowledge, skill, experience, training, or education," but only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  The rule incorporates the principles established in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 589 (1993) in which the Supreme Court charged trial courts with a gatekeeping role to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Hathaway v. Bazany, 507 F.3d 312, 317 (5th Cir. 2007); In re Pool Prods. Distribution Mkt. Antitrust Litig., 166 F. Supp. 3d 654, 661 (E.D. La. 2016) (clarifying that the Daubert gatekeeping function applies to all forms of expert testimony).

Under Daubert a Court has two roles: determining whether the evidence is reliable and analyzing whether the evidence is relevant. Daubert, 509 U.S. at 590-593. See also United States v. Cooks, 589 F.3d 173, 179 (5th Cir. 2009).  The Fifth Circuit has explained the meaning of "reliable" and "relevant" in this context in these terms: "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid [and] [r]elevance depends upon whether [that] reasoning or methodology properly can be applied to

the facts in issue." Leblanc v. Chevron USA, Inc., 396 F. App'x 94, 97 (5th Cir. 2010) Knight v. Kirby Inland Marine Inc., 482 F.3d 347, 352 (5th Cir. 2007). Courts must focus "solely on principles and methodology, not on the conclusions that they generate." Id. at 595; Moore v. Ashland Chem., Inc., 151 F.3d 269, 275-76 (5th Cir. 1998) (same); Watkins v. Telsmith, Inc., 121 F.2d 984, 988-89 (5th Cir. 1980); In re Pool Prods., 166 F. Supp. 3d at 661 (the "aim is to exclude expert testimony based merely on subjective belief or unsupported speculation"). See also Wells v. Smithkline Beecham Corp., 601 F.3d 375, 378 (5th Cir. 2010) ("Although there are no certainties in science, the expert must present conclusions ground[ed] in the methods and procedures of science"); Tamraz v. Lincoln Elec. Co., 620 F.3d 665, 675 (6th Cir. 2010) ("The important thing is not that experts reach the right conclusion, but that they reach it via a sound methodology").

Reliability can be assessed in a number of ways. Testimony can be reliable if it is "based on sufficient facts or data," or "the product of reliable principles and methods" which the expert in turn has applied to the facts of the case. Fed. R. Evid. 702. See also 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000) (a court should "exclude proffered expert testimony if the subject of the testimony lies outside the witness's area of expertise.") In other words, a party cannot qualify as an expert generally by showing that the expert has specialized knowledge or training which would qualify him or her to opine on some other issue. Redman v. John D. Brush & Co., 111 F.3d 1174, 1179 (4th Cir.1997); Barrett v. Atl. Richfield Co., 95 F.3d 375, 382b (5th Cir.1996). Courts within the Fifth Circuit have repeatedly held that despite a Court's discretion, "expert testimony must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et. alia." In re

Pool Prods., 166 F. Supp. 3d at 662 citing Knight, 482 F.3d at 355 (5th Cir. 2007).  See also Moore, 151 F.3d at 278 n. 10 (any step that renders an opinion unreliable is inadmissible, even if that step merely misapplies or changes a reliable methodology). "Where the expert's opinion is based on insufficient information, the analysis is unreliable."  Id. citing Paz v. Brush Engineered Materials, Inc., 555 F.3d 383, 388 (5th Cir. 2009).  See also Garcia v. BRK Brands, Inc., 266 F. Supp.2d 566, 573-74 (S.D. Tex. May 27, 2003) (noting to be deemed reliable the opinion "must be grounded in the method and procedures of science" and "must be more then mere subjective belief" or speculation).

Further, when considering reliability Daubert dictates that trial courts should consider the following  non-exclusive factors: (1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high rate of error and whether there are standards controlling the technique's operation; and (4) whether the technique is "generally accepted" within the "relevant scientific community."  Hathaway, 507 F.3d at 318 citing Daubert, 509 U.S. at 593-94.  See Johnson v. Arkema, Inc., 685 F.3d 452, 459 (5th Cir. 2012) (reiterating non-exclusive factors considered when conducting reliability inquiry).  The focus of a court's evaluation should be on whether an expert's testimony "is scientifically valid," by examining the non-exclusive set of factors outlined above, thus "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Daubert, 509 U.S. at 580, 600 (emphasis added). See also Wells, 601 F.3d at 378 ("Although there are 'no certainties in science,' the expert must present conclusions 'ground[ed] in the methods and procedures of science.")

In terms of relevance, the key question is whether the reasoning or methodology "fits" the facts of the case and will thereby assist the trier of fact to understand the evidence.  In re Pool

Prods., 166 F. Supp. 3d at 662 citing Daubert, 509 U.S. at 591.  "[F]undamentally unsupported opinions "offer[] no expert assistance to the jury" and should be excluded.  Id. citing Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005).  See also Diggs v. Citigroup, Inc., 551 F. App'x 762, 764-65 (5th Cir. 2014); McCune v. Graco Children's Prods., Inc., 495 F. App'x 535, 539 (5th Cir. 2012) (per curium).  See also Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005) (noting "fundamentally unsupported opinions offer[] no expert assistance to the jury" and should be excluded); In re Pool Prods., 166 F. Supp. 3d at 662.

"In short, under Daubert and its progeny, a party proffering expert testimony must show by a 'preponderance of proof' that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case."  Pride v. BIC Corp., 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592 n.10.  See Garcia, 266 F. Supp. 2d at 573-74.  Again, an expert's opinion must be based on methods and procedures of science, rather then on subjective belief or unsupported speculation.  See Pride, 218 F.3d 566, 578 (6th Cir. 2000) citing Daubert, 509 U.S. at 592 ("This requirement, [that the testimony assist the trier of fact] has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result(s) being offered and the disputed factual issues in the case in which the expert will testify").  Likewise, Rule 702 "requires that the evidence or testimony assist the trier of fact to understand the evidence or to determine a fact in issue." "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."  Daubert, 509 U.S. at 591 (citation and internal quotation marks omitted).  "[A]n expert's opinion should not be admitted if it does not apply to the specific facts of the case." Diggs v. Citigroup, Inc., 551 F. App'x 762, 765 (5th Cir. 2014) citing Kumho Tire, 526 U.S. at

154.  For example, in <u>Gen. Elec. Co. v. Joiner</u>, the Supreme Court explained that "nothing in either Daubert or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  <u>Atlantic Specialty Ins. Co. v. Porter, Inc.</u>, 2016 WL 6569346 at *3 (E.D. LA. Nov. 4, 2016) <u>citing</u> <u>Joiner</u>, 522 U.S. 136, 146 (1997).  Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Id</u>.; <u>see</u> <u>also</u> <u>LeBlanc</u>., 396 Fed.Appx. at 98; <u>De Boulle Diamond & Jewelry, Inc. v. Boulle</u>, Ltd., 2015 U.S. Dist. LEXIS 182435 at *4 (N.D. Tex. Jan. 21, 2015).

**IV.    LEGAL ARGUMENT**

   **a.    Integrity Experts Cannot Render the Opinion that the Benoit Fire Would Still Have Occurred if the CSST was Bonded.**

Expert testimony must show that the expert whose testimony is being offered is qualified and will testify to scientific knowledge that will assist the trier of fact in understanding and disposing of issues relevant to the case.  <u>Pride</u>, 218 F.3d 566, 578 (6th Cir. 2000) <u>citing</u> <u>Daubert</u>, 509 U.S. at 592 n.10.  An expert's opinion cannot be based on subjective belief or unsupported speculation; but rather, must be based on methods and procedures of science.  <u>Leblanc</u>, 396 F. App'x at 97; <u>Knight</u>, 482 F.3d at 352; <u>In re Pool Prods.</u>, 166 F. Supp. 3d at 662.  Courts must focus "solely on principles and methodology, not on the conclusions that they generate." <u>Daubert</u>, 509 U.S. at 595; <u>Moore</u>, 151 F.3d at 275-76 (explaining focus is not on the result or conclusion, but on the methodology); <u>Watkins</u>, 121 F.2d at 988-89.

Moreover, the "requirement, [that the testimony assist the trier of fact] has been interpreted to mean that scientific testimony must 'fit' the facts of the case, that is, there must be a connection between the scientific research or test result(s) being offered and the disputed factual issues in the case in which the expert will testify."  <u>See</u> <u>Pride</u>, 218 F.3d 566, 578 (6th Cir.

2000) <u>citing</u> <u>Daubert</u>, 509 U.S. at 592. An expert's opinion that does not apply to the specific facts of the case should not be admitted.  <u>See</u> <u>Diggs</u>, 551 App'x at 765; <u>Boulle</u>, 2015 U.S. Dist. LEXIS at *4.

For example, in <u>Garcia</u>, a district court within the Fifth Circuit reviewed in part, the court's Daubert ruling, which precluded plaintiff's experts from testifying as the experts failed to perform testing related to the facts of the case, and instead were made on mere "unsupported speculation."  266 F. Supp. 2d 566 (S.D. Tex. May 27, 2003).  In that case, the plaintiffs alleged a smoke detector defect was the cause of the decedent's death, specifically the detector's failure to alarm as a result of "fretting corrosion" between the horn element and horn driver circuit. <u>Id.</u> at 569.  The court noted that all of the plaintiffs' claims ultimately required proof that the detector should have alarmed before the decedent became incapacitated by carbon monoxide. <u>Id.</u> at 570-71.  In particular, the court in its review found that none of the plaintiffs' experts even applied the facts of the case at hand to their testing, using different smoke detector models and failing to make "sufficient attempts to replicate the conditions in [the decedent's] residence prevailing at the time of his death." <u>Id.</u> at 575.  Moreover, the court concluded that although the experts' opinion was "certainly plausible," it was insufficient under <u>Daubert</u> as at most it was "scientifically grounded speculation." <u>Id.</u> at 577.

As discussed *supra* the Integrity experts' opinion and related testimony (as put forth primarily by Mr. Colwell) that even if the CSST in the Benoit home had been bonded the fire would still occur is dubious and unconvincing, as the Integrity experts did not attempt to account for or even acknowledge certain limitations in their more standardized testing, nor does the test "fit" the facts of the case; namely there is no connection between the research/testing being offered and the facts of the Benoit incident.  Simply put the Integrity experts' proposed

testimony and/or opinion that the fire at the Benoit home would have occurred even if the CSST was bonded does not rest on a reliable foundation, nor can it be considered relevant to the facts of the case.

The particular testing upon which the Integrity experts now rely "was more of a generalized test," and was "not specifically [performed] for the Benoit matter." Exhibit B at pp. 81-82. In fact, Mr. Colwell acknowledged that this more "generalized test," relates more to "what [they] see most of the time in [their other] cases." See Exhibit B at p. 83. Similar to the experts in Garcia, who failed to make any attempt to fit the conditions of the case to their tests, here the Integrity experts have failed to apply any of the specific facts of this case to their testing; instead simply relying on their more generalized or standard testing. See Garcia, 266 F. Supp.2d at 573-74. Notably, the Integrity experts lack any rationale as to why additional testing relating to and replicating the facts/circumstances in this instance was not performed.

In summary, the Integrity experts should be precluded from offering the opinion and/or related testimony that this fire would have occurred if the CSST was bonded, as Integrity failed to take any steps to apply this test to the facts at hand.

**b.    Integrity Experts Cannot Render the Opinion or Offer Testimony that the Hole in the CSST at the Benoit Home was Caused By Lightning.**

The Fifth Circuit has routinely held that "[r]eliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." Leblanc, 396 F. App'x at 97. Moreover, in determining whether to exclude testimony and/or opinions, courts must focus "solely on principles and methodology, [rather then] on the conclusions…" Id.; Moore, 151 F.3d at 276-76. "Although there are no certainties in science, the expert must present conclusions ground[ed] in methods and procedures of science." Wells, 601 F.3d at 378. See also Tamraz, 620 F.3d at 675 ("The important thing is not that experts reach the right

conclusion, but that <u>they reach it via a sound methodology</u>").  <u>Daubert</u> (and its progeny) dictates that trial courts should consider certain non-exclusive factors, including (1) whether a theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high rate of error and whether there are standards controlling the technique's operation; and (4) whether the technique is "generally accepted" within the "relevant scientific community."  <u>Hathaway</u>, 507 F.3d at 318. "If an expert uses hypothetical explanations for causes of an event, those hypotheticals must have analytically sound bases rendering them more then mere speculation" and/or conjecture. <u>DePaepe v. General Motors Corp.</u>, 141 F.3d 715, 720 (7th Cir. 1998).  "[N]othing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert."  <u>Atlantic Specialty Ins. Co. v. Porter, Inc.</u>, 2016 WL 6569346 at *3 (E.D. LA. Nov. 4, 2016) <u>citing</u> <u>Joiner</u>, 522 U.S. 136, 146 (1997).  Rather, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." <u>Id.</u>; <u>see</u> <u>also</u> <u>LeBlanc</u>., 396 Fed.Appx. at 98; <u>De Boulle Diamond & Jewelry, Inc. v. Boulle, Ltd.</u>, 2015 U.S. Dist. LEXIS 182435 at *4 (N.D. Tex. Jan. 21, 2015).

     As discussed *supra*, the Integrity experts' opinion and related testimony that the hole in the CSST was caused by lightning lacks foundation as they did not look at the lightning strikes in the vicinity of the Benoit home, and instead is based entirely on Mr. Spruiell's assumption that one of the lightning strikes would have had enough energy to cause the hole.  <u>See</u> Exhibit C at pp. 20, 35-38.

     Mr. Spruiell's opinion that a lightning strike within the vicinity of the Benoit home had the capability of transferring seven to ten coulombs of charge rests entirely on his own

assumption and reliance on the median figure of fifteen coulombs.  See Exhibit C at pp. 35-37; 37-38 (admitting he was using the median to calculate the lightning transfer).  Notably, Mr. Spruiell testified that he "did not confirm" that any of the lightning strikes near the Benoit home could have been at or greater fifteen coulombs of charge; noting "there's a pretty good chance at least one of them is going to be more then 15 [coulombs]."  Exhibit C at p. 36-37.  From that, Mr. Spruiell assumed that one of the strikes in the vicinity of the Benoit home would have had enough energy to cause the hole.  See Exhibit A at p. 8 (second paragraph); Exhibit C at pp. 35-36.  Of course, in reality, there was no strike reported that could have produced 15 coulombs of energy which explain his admission of Mr. Spruiell.

Further, Mr. Spruiell admitted that ""there is a calculation routine, that [he] could [have done] … to predict how many coulombs there are in a flash given the peak kilo-amps," although the results would be dictated by the waveform chosen.  Exhibit C at pp. 37, 39.  Notably, Mr. Spruiell did not even attempt this calculation, despite admitting that he has used such a calculation in other cases he has worked on.  Exhibit C at pp. 37-39.  Moreover, Mr. Spruiell failed to consider or even acknowledge the possible corroborating physical evidence, namely the chimney cap, in rendering his opinion.  Instead, Mr. Spruiell testified that he did not inspect or examine the chimney cap, nor did he use the "generally accepted" Hagenguth calculation to calculate the coulombs of charge that would have caused damage to the chimney cap in this instance.  See Exhibit C at pp. 22, 40-43.  Notably, Mr. Spruiell admitted that "[i]t might be possible to have a look at the chimney cap and see what size holes and what amount of damage it has and … confirm it that way;" however, [he had] not given that any thought though."  Exhibit C at p. 40.  See also Exhibit C at p. 40-41 (acknowledging that he could have looked at the chimney cap and performed that calculation, but [f]rankly, [he] hadn't considered that before").

30

Based on Mr. Spruiell's testimony it is evident that this opinion is not based on any scientific or reliable methodology, and in fact, ignores "generally accepted" methodologies, like the Hegenguth calculations. Indeed, despite admitting that he could have calculated the current charge from lightning strike(s) to cause the hole, and noting that he had performed such calculations in other cases he is involved in, Mr. Spruiell chose not to perform any analysis and instead merely relied on the median figure of fifteen coulombs. See Exhibit C at pp. 36-38, 40-43. This assumption is insufficient under Daubert and Rule 702, as it clearly fails to provide any analytically sound bases or scientific reasoning behind this opinion. Instead, Mr. Spruiell (and the Integrity experts) rests his opinion on unsupported speculation and/or conjecture, and, therefore, this opinion and related testimony should be excluded.

### c.    Integrity Experts Cannot Render the Opinion or Offer Testimony that, if an Arc Occurred, it Resulted in Sustained Ignition in this Instance.

As discussed *supra* pursuant to Rule 702 and Daubert (and its progeny), the focus of a court's evaluation should be on whether an expert's testimony "is scientifically valid," by examining the non-exclusive set of factors outlined above, thus "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert, 509 U.S. at 580, 600 (emphasis added). See also United States v. Langan, 263 F.3d 613, 621 (6th Cir. 2001) (noting to determine reliability a court may consider "testing, peer review, publication, error rates, the existence and maintenance of standards controlling the technique's operation, and general acceptance in the relevant scientific [or technical] community.") However, expert testimony that constitutes mere personal belief invades the province of the jury. McGowan v. Cooper Indus., Inc., 863 F.2d 1266, 1273 (6th Cir.1987) (emphasis added). See also In re Pool Prods., 166 F. Supp. 3d at 661 (the "aim is to exclude expert testimony based merely on subjective belief or unsupported speculation"); Garcia, 266 F. Supp. 2d at 573-74. "If

an expert uses hypothetical explanations for causes of an event, those hypotheticals must have analytically sound bases rendering them more then mere speculation" and/or conjecture. DePaepe v. General Motors Corp., 141 F.3d 715, 720 (7th Cir. 1998).   Moreover, to be considered relevant, there must be a connection between the scientific research or test result being offered and the disputed factual issues in the case in which the expert will testify.  See In re Pool Prods., 166 F. Supp. 3d at 662.  Indeed, "an expert's opinion should not be admitted if it does not apply to the specific facts of the case."  Id. at 675 citing Diggs, 551 F. App'x at 765; see also Garcia, 266 F. Supp. 2d at 575.

In Atlantic Specialty Ins., the plaintiff alleged that a fire on a boat was caused by an electrical malfunction attributable to corroded wiring in the port side of the boat, which caused a short circuit that energized wires, causing the wiring to then overheat and ignite a fire.  2016 WL 6569346  at *1 (E.D. LA Nov. 4, 2016).   In connection with plaintiff's allegations, Plaintiff offered a marine surveyor as an expert, who performed two "hose tests;" one on the boat at issue, and one on a different model of boat that was "similar" to the boat at issue.  Id.  The hose test involved placing a garden hose on the boats wet bar, hosing it down, and seeing if water leaked onto the electrical wiring harness below.  Id.  As a result of these two "hose tests," the expert made a finding of defective design.  Id.

Ultimately, the Atlantic Specialty Ins. court precluded plaintiff's expert from offering a "hose test" and from testifying as the test was not substantially similar to the conditions in the case at hand.  2016 WL 6569346 (E.D. LA Nov. 4, 2016).  Specifically, the Court held that "[i]f experimental evidence is a simulation or recreation of the event in question, then the recreation and the event it seems to replicate must be substantially similar.  Id. at *5.  See also id. at 6 ("they must be similar enough to afford a fair comparison in respect to the particular issue to

which the test is directed").   Although the conditions need not be identical, to avoid misleading the jury, it should be "nearly the same in substantial particulars as to afford a fair comparison in respect to the particular issue to which the test is directed." Id. at 5.  Moreover, if the "proffered evidence is not meant to recreate an event, but instead simply demonstrate scientific principles, then the substantial similarity requirement does not apply.  Id. citing McCune v. Graco Children's Products, Inc., 495 Fed. Appx. 535, 540 (5th Cir. 2012).   Given, however, that the "hose test" was offered as "evidence of how the water was entering the boat's mechanical system," the Court determined that the tests were not being offered as demonstrative evidence, but rather as a recreation of the events of the case at hand, and further, that the tests were not a "fair comparison" as the tests did not indicate the details surrounding the test (e.g. how long the hose ran, the type of hose, the pressure of the water, etc.).  Id. at *6.

As a result of the Court's finding that the hose tests were not substantially similar to the case at hand, the Atlantic Specialty Ins. Court concluded that the expert could not offer opinion or testimony, as any opinion he offered regarding a defect would be based on the hose tests, which again, failed to identify critical standards and controls used, and, therefore, could not be considered reliable.  Id.

In Gopalratnum a district court barred plaintiffs from using multiple expert witnesses as their opinions were based on speculation and unfounded inferences, and therefore unreliable. See generally, Gopalratnam, 2017 U.S. Dist. LEXIS 40386 (E.D. Wis. Mar. 21, 2017).  In that case the plaintiffs alleged that the "internal failure of [a] lithium ion battery" in plaintiffs' son's laptop caused a fire in the plaintiffs' home, which originated in the "area [on plaintiffs' son's] bed where his laptop sat." Id.  at *3-6, 38-39.  In particular, the court found that the opinion of the "battery expert," who opined that a manufacturing defect in the battery caused the fire, was

unreliable as the conclusion consisted of unsubstantiated conclusory statements, not supported by scientific methodology or case specific testing.  Id.  at *33-34.  The court based this determination on the fact that the battery expert made the assumption, without conducting any related testing, that the subject battery cell expelled its contents as a result of internally generated heat, rather then external heat.  Id.  at *33.  Indeed, the court noted that even the expert during his deposition acknowledged that a cell may expel its contents during a fire, but that does not necessarily mean that the cell started the fire.  Id. at *34.

As previously discussed, the Integrity experts' testimony and/or opinion that an object was within or close enough to the path of the alleged gas jet to cause and sustained ignition at the Benoit home stems from the assumption or belief (particularly Mr. Colwell's) that a recessed light fixture was located close enough to the CSST and within the path of the alleged gas jet that it could have resulted in sustained ignition.  See Exhibit B at pp. 53, 66-67. See also Exhibit A (devoid of any such theory or discussion of the presence of such an object at the Benoit home). However, when asked how close the recessed light was to the CSST, Mr. Colwell responded, "I would say it's very close based off where the hole [in the CSST was]."  Exhibit B at p. 52. Without more, Mr. Colwell presumes that simply because there was a hole in the CSST, the light fixture must have been close to the CSST and was in fact the object which led to sustained ignition.  Id.  Additionally, the Integrity experts' report fails to identify the lamp or any other material as such an object at the Benoit home.  See Exhibit A.  Moreover, it would seem that pursuant to Fed. Rule 26, which requires all expert reports be detailed and complete, the Integrity experts cannot now expand or provide that there was such an object, namely the light or other materials, present at the Benoit home, as such details were not included in their report.  See Fed.

Rule 26; R.C. Olmstead, 657 F. Supp. 2d 905 (N.D. Ohio 2008), affirmed by 606 F.3d 262 (6th Cir. 2010); Salgado by Salgado, 150 F.3d at 742 n. 6.

Simply put, the proposed testimony and/or opinion regarding sustained ignition at the Benoit home does not **rest[] on a reliable foundation**…" and must therefore be excluded. See Daubert, 509 U.S. at 580, 600 (emphasis added). In fact, there is nothing in this case (apart from Mr. Colwell's assumption), that demonstrates the can light (or some other object) was close enough (specifically three-fourths of an inch) from the CSST in the Benoit home. Notably, all three (3) Integrity experts acknowledged that they had no knowledge as to how close the can light was to the CSST. See Exhibit B at p. 53, 66-67, Exhibit C at pp. 30-31; Exhibit D at p. 55. Much like the battery expert in Gopalratnam who assumed that the battery cell ejected its content as a result of internally generated heat, the Integrity experts fail to move past their own assumptions. Indeed, even the two (2) Integrity experts allegedly involved in this testing, could not place the can light within even six (6) inches of the CSST, let alone with one inch of the CSST.[14] Exhibit B at pp. 52-53 (Colwell noting the can light was "within a matter of few inches maybe, maybe closer, maybe a little bit more … I would not be able to tell you that its exactly six inches away from the CSST line"), 66; Exhibit D at p. 55 (testifying he could not place the light within even feet of the CSST). Moreover, Mr. Colwell testified that even though he believes it was *probable* that the can light *could have been* close enough to the CSST at the Benoit home, he could not actually identify what specific object, if any, was within an inch from the hole of the CSST. Exhibit B at pp. 67-68. Again, personal beliefs or conclusions are insufficient to establish reliability, and without sufficient data and facts, an expert witness cannot

---

[14] Apart from Mr. Colwell, it is unclear as to whether any other Integrity expert was actually involved in this testing, as both Mr. Spruiell and Mr. Hergenrether deferred to the other in part. See Exhibit C at pp. 30-31 (Spruiell admitting "that's all Mr. Colwell and Hergenrether's work"); Exhibit D at pp. 43-44 (admitting he is familiar with the testing, but noting there was other testing performed, which was performed by Spruiell).

be found reliable.  See In re Pool Prods., 166 F. Supp. 3d at 661; Gopalratnam, 2017 U.S. Dist. LEXIS at *46 (noting that the cause and origin expert's assumption that flashover did not occur without more, particularly a test that he could have performed to confirm or disprove that assumption, could not be considered reliable); Garcia, 266 F. Supp.2d at 573-74 (precluding experts that had failed to use the appropriate and alleged models of alarm product, which could have been tested).

Even assuming *arguendo* that the can light was six (6) inches from the CSST at the Benoit home, the Integrity experts did no testing to determine if ignition *could* occur at any distance greater than three-fourths of an inch, and any testing they did perform is not applicable to the specific facts at hand.[15]  See Exhibit C at pp. 29, 33-35.  As discussed *supra* and testified by the Integrity experts, their related testing involved an object placed at either one-eights or three-fourths of an inch away from the CSST and within the path of the gas jet.  Exhibit A at p. 8 (first paragraph); Exhibit C at pp. 29, 33-34.  See also Exhibit C at pp. 31-33 (testifying that they had a greater percentage of sustained ignitions when the electrode was moved closer to one-eighth of an inch away from the CSST, and that of their testing with jacketed CSSTs only two of eight tests at three-fourths of an inch away from the CSST and in the direct path of the gas jet sustained a flame).  In fact, with respect to ignition, the Integrity experts did no testing related to the specific facts of this case whatsoever.  Instead, the Integrity experts relied on previous research/testing related to a paper they had authored years earlier.  Exhibit A at pp. 7-8; Exhibit C at pp. 11-12 (agreeing the testing described was related to their paper); Exhibit D at pp. 42-44

---

[15] Although the can light is mentioned within the report, no such object within the path of the gas jet or in such close proximity to the CSST was identified or discussed within the Integrity report.  See Exhibit A at pp. 6, 8.  Indeed, Mr. Colwell testified that to the extent he addressed this; he would have addressed it in the one paragraph on page 6 of the report relating to the electrical devices closet.  See Exhibit A at p. 6 (last paragraph); Exhibit B at pp. 70-71.  That particular paragraph (and the remaining portions of the report) fails to identify any such object or even discuss this theory supporting alleged ignition.  See generally, Exhibit A.  Again, Fed. Rule 26 would seem to preclude the Integrity experts from now expanding or providing that there was such an object at the Benoit home, namely the light or other materials within their report.  See Fed. Rule 26.

(noting the testing was conducted years before this loss in connection with a paper authored by Integrity and was not specific to this case).  The test performed in connection with the Integrity experts' paper, which supposedly supports their conclusion that ignition occurred at the Benoit home as a result of an arc, involves entirely different and distinct circumstances than the conditions in this case.  See Exhibit C at pp. 34-35.  In particular, Mr. Spruiell admitted that the testing performed in connection with their paper (which they now rely on in their report) involved an object at *three-fourths of an inch away* from the CSST, which was *within the path* of the gas jet.  Exhibit C at pp. 29, 34.  Further, he acknowledged that the test would not answer whether a recessed light fixture at six (6) inches away from the CSST would sustain ignition as their test only looked at objects three-fourths of an inch away.  Exhibit C at pp. 11, 29, 34-35

Similar to the experts in Atlantic Specialty Ins. and Garcia, who failed to make any "attempts to replicate [or simulate]  the conditions" of the case at hand, here the Integrity experts have failed to apply any of the specific facts of this case to their testing; instead simply relying on previous unrelated testing.  See id.  See also Garcia, 266 F.2d at 573-74; Atlantic Specialty Ins., 2016 WL at *6.  Indeed, Mr. Spruiell admitted that the circumstances in this case were "different from the conditions of [their] test [for their paper]."  See Exhibit C at pp. 33-35.  Further, even assuming *arguendo* that the Integrity experts' theory regarding the can light was plausible, at best that theory would be grounded in speculation and would still be insufficient under Daubert.  See Garcia, 266 F.Supp. 2d at 577.  See also Diggs v. Citigroup, Inc., 551 F. App'x 762, 764-65 (5th Cir. 2014); McCune v. Graco Children's Prods., Inc., 495 F. App'x 535, 539 (5th Cir. 2012) (per curium)In re Pool Prods., 166 F. Supp. 3d at 662  citing Guile, 422 F.3d at 227 (noting "fundamentally unsupported opinions offer[] no expert assistance to the jury" and should be excluded).

In summary, the Integrity experts' opinion and related testimony that there was an opposing electrode or an object within an inch of the CSST hole which caused sustained ignition is unreliable and will not assist the trier of facts, because this opinion and testimony is not based on sufficient facts or sound methodology/reasoning that applies to the facts of this case.

> **d.      The Integrity Experts, specifically Mr. Colwell, are not qualified to render the opinion that certain warnings or instructions within the Omega Flex D&I guide are confusing, nor will it assist the trier of fact.**

In addition to requiring an expert's opinion be reliable and relevant, Rule 702 and Daubert (and its progeny), require that the opinion assist the trier of fact. In re Pool Prods., 166 F. Supp. 3d at 662; see also Guile v. United States, 422 F.3d 221, 227 (5th Cir. 2005) (noting "fundamentally unsupported opinions offer[] no expert assistance to the jury" and should be excluded); Boulle, 2015 U.S. Dist. LEXIS 182435 at *4 (when deciding whether to admit expert testimony, "[a] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered"). Moreover, in order to offer a qualified opinion, the subject of the opinion or testimony must lie within the witness's area of expertise. See also 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000).

Here, the Integrity experts, particularly Mr. Colwell, cannot opine or offer testimony that the D&I guide, particularly Section 4.10, is ambiguous or confusing as he is not qualified to make such an opinion, nor will his opinion aid or assist the trier of fact. As discussed *supra*, Mr. Colwell's opinion regarding the instructions or warnings within Section 4.10 of the D&I guide stems from what he characterized as his view as an "electrician." Exhibit B at p. 61. During his deposition, Mr. Colwell testified that the Omega Flex D&I guide is ambiguous and/or confusing because one sentence in Section 4.10 states that "[t]he bonding requirement is a requirement of the National Electrical Code." Exhibit B at pp. 56, 58-61. See also Exhibit B at p. 59 (noting he

would agree bonding is a requirement of the code, but "not in the manner stated" in the D&I guide). However, Mr. Colwell is not qualified to offer this opinion.

Admittedly, Mr. Colwell testified that he is not an expert in warnings, nor does he have any experience with human factors analysis, and has never written a warning for any product. Exhibit B at pp. 55-56, 62. Mr. Colwell (although certified to install another manufacturer's product) is not certified to install TracPipe, nor has he ever installed or overseen the installation of CSST in a residence. Exhibit B at p. 21. Moreover, when asked about his methodology for this opinion, Mr. Colwell could offer nothing beyond his personal and unsupported beliefs, responding as follows:

> **I'm sure, if I thought about it long enough, I could come up with something from the standpoint of the scientific method.** I'm just telling you as an electrician reading it [if] a plumber asks me, hey, you need to bond the gas piping; … I understand [that] I need to bond the gas piping. And [I] [would] go off the [National Electrical] code; [rather then the D&I guide].

Exhibit B at p. 61 (emphasis added). In spite of this testimony, Mr. Colwell conceded that product manufacturers are not confined to the requirements within the National Electrical Code, and can have additional requirements in excess or outside of the code. Exhibit B at p. 57. When pressed as to "why … Omega Flex [would] have included … additional information [in Section 4.10] regarding what 'must be attached' [in connection with installing and bonding the CSST]," Mr. Colwell responded that he believed it merely "encompasse[d] a lot of background." Exhibit B at p. 59. Again, a witness cannot qualify as an expert if the subject lies outside the witness's area of expertise or specialized knowledge. See 4 Weinstein's Fed. Evid. § 702.06[1], at 702–52 (2000); Redman, 111 F.3d at 1179; Barrett, 95 F.3d at 382.

Moreover, with respect to this case, Mr. Colwell testified to the following:

Q.    Do you have any idea as to whether or not [the installer] was confused by this section of the D[&]I guide?

A.    I have not spoken to the installer in this case.

Q.    And you have no idea, since you don't know this person, regarding the state of mind that [the] installer would have had when he read Section 4.10 of the D[&]I guide; is that right?

A.    I have not spoken to the installer in this case.  I don't know that the installer even got the installation instructions … I mean it's kind of one of those again, as I'm [sitting] here as an electrician reading this, it is confusing …

* * *

Q.    Do you have any knowledge regarding the training of the installer of the CSST in the Benoit home?

A.    No, I have not spoken to the installer of the CSST in the Benoit home.

Q.    If I were to represent to you that the installer of the CSST at the Benoit home was not trained or certified by Omega Flex, that he wouldn't even have been given by Omega Flex a copy of the D[&]I guide --

A.    I haven't spoken to the installer, nor do I know what he had.  I don't know if he was certified and I don't know what information he had.

Exhibit B at pp. 61, 63.

This opinion and related testimony cannot be considered relevant or an opinion that would assist the trier of fact, as a trier of fact has no need for expert opinions which are based on mere personal beliefs rather then sufficient facts.  Tamraz, 620 F.3d at 675 (noting it is not important at this stage that an expert reached the right conclusion, but rather that the expert reached it via a "sound methodology").  See also In re Pool Prods., 166 F. Supp. 3d at 661 (the "aim is to exclude expert testimony based merely on subjective belief or unsupported speculation"); see also Wells, 601 F.3d at 378 ("Although there are no certainties in science, the expert must present conclusions ground[ed] in the methods and procedures of science"); Leblanc, 396 F. App'x at 97; Knight., 482 F.3d at, 352; Moore, 151 F.3d at 275-76 (explaining the focus is not on the result or conclusion, but on the methodology).  Much like in Gopalratnam,

where the battery expert failed to present any scientific methodology, testing or evidentiary support for his opinion that a manufacturing defect caused the fire, here Colwell does not present any analytically sound bases or any methodology for that matter that would render his opinion anything more then mere speculation.  See Gopalratnam, 2017 U.S. Dist. LEXIS at *33.

In conclusion, Mr. Colwell's opinion that the D&I guide's instructions and/or warnings are ambiguous or confusing is unreliable and irrelevant, because he is not qualified to render such an opinion, nor would his "opinion" assist the trier of fact in any way as his opinion is not based on any sound methodology or reasoning.

## V.    <u>CONCLUSION</u>

Wherefore, pursuant to Federal Rule of Civil Procedure 26, Federal Rule of Evidence 702, and the requirements espoused in <u>Daubert v. Merrell Dow Pharms., Inc</u>., 509 U.S. 579 (1993) and its progeny, the Integrity experts should be excluded from testifying regarding the following opinions in their July 28, 2017 report as they are neither qualified nor are their opinions reliable or relevant:

1. The fire at issue would have occurred if the CSST was bonded;

2. The hole in the CSST was caused by lightning;

3. If an electrical arc had occurred, it resulted in sustained ignition; and

4. The applicable Omega Flex Design Guide and Installation Instruction ("D&I Guide") is ambiguous or confusing.

41

Respectfully submitted,

Dated December 13, 2017                Defendant Omega Flex, Inc.,


BY:    /s/ David R. Frohn
**DAVID R. FROHN**, Bar No. 5758
MANION GAYNOR & MANNING LLP
2201 Lake Street, Suite 106
Lake Charles, LA  70601-7199
Telephone:     (337) 419-1929
Facsimile:     (337) 564-6899
Email: dfrohn@mgmlaw.com


BY:    /s/ Cullen W. Guilmartin
Cullen W. Guilmartin (*Pro Hac Vice*)
GORDON & REES LLP
95 Glastonbury Blvd., Ste. 206
Glastonbury, CT 06033
Tel: (860) 494-7513
Fax: (860) 560-0185
Email: cguilmartin@grsm.com

1122301/35883245v.4

42