# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

**USAA GENERAL INDEMNITY COMPANY,**
**AS SUBROGEE OF CLAUDE BENOIT,**

       **Plaintiff**

                                       **Civil Action No.: 3:16-cv-498-JWD-RLB**

**V.**

**OMEGA FLEX, INC.**
**A Foreign Corporation,**

       **Defendant.**

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION IN LIMINE TO EXCLUDE CERTAIN OPINION TESTIMONY OF DR. TIMOTHY MORSE

TO THE HONORABLE UNITED STATES DISTRICT COURT:

       Now comes Plaintiff United Services Automobile Association as subrogee of Claude Benoit (hereinafter "USAA"), by and through its attorneys of record, and moves to strike certain opinion testimony of Dr. Timothy Morse, and for good cause shall show unto this Court the following:

## I.      BRIEF FACTUAL BACKGROUND GIVING RISE TO THIS LAWSUIT

1.     Claude Benoit owned a home located at 10592 Creek Haven Drive, Denham Springs, Louisiana. USAA was Claude Benoit's homeowners' insurance carrier. On June 24, 2015, the home was destroyed in a severe fire that ignited after lightning struck Benoit's ornamental metal chimney cap.[1] The fire started as a result of electrical energy flowing from the chimney cap, down the metal flue, then through the home's corrugated stainless steel tubing (commonly referred to as "CSST") that was connected to the gas burner inside the fireplace.[2] The electrical energy from the

---

[1] *See* pg. 5 of Integrity report dated July 28, 2017, attached as Exhibit A.
[2] Exhibit A.

lightning strike perforated two holes in the CSST and ignited the escaping natural gas.[3] (*Fig. 1, below*)



2.      CSST is a very thin walled (ten mils or approximately as thin a four sheets of paper) tube that has been marketed since the 1990's as a replacement for black iron pipe, which was traditional used for gas distribution inside homes.   The CSST that was installed at the Benoit home was yellow-jacketed CSST.   The name "yellow-jacketed" is derived from the color of the CSST's insulating material. Yellow-jacketed CSST has proved itself to be uniquely vulnerable to damage caused by electrical energy from a lightning strike.   Specifically, the electrical energy from a lightning strike has the potential to puncture holes in CSST's wall as it flows across the corrugations.   In fact, the concern about lightning-induced punctures of yellow-jacketed CSST caused the City of Lubbock to ban its use as of May 16, 2016, after a Lubbock resident was killed in a fire at his home that was caused by a lightning-induced failure of yellow-jacketed CSST.

3.      Omega Flex, Inc. manufactured the yellow-jacketed CSST that was installed at the Benoit home.  The length of CSST where the two holes were located ran from the home's north end and

---

[3] Exhibit A.

connected to the fireplace's gas log. (*See Fig. 2*).  The holes were discovered along the CSST in the attic space above the living room, near the chimney.[4]

4.      Omega Flex retained Dr. Timothy Morse to proffer several opinions in this matter.[5]  Dr. Morse never went to the Benoit home to conduct a post-fire examination.[6]  His knowledge of the Benoit home is based on his review of photographs taken by the assistant of Omega Flex's origin and cause expert, Dave Smith.[7]  Nevertheless, Dr. Morse agrees that the fire started in the home's attic area; however he opined that the fire started in the attic over the carport.[8]  Furthermore, Dr. Morse agrees that lightning struck the ornamental metal chimney cap and passed down the metal flue, and through the CSST where the holes were found, until it reached the ground.[9]  He agrees that energy produced by lightning can puncture holes in CSST.[10]  Lastly, he agrees that the holes find in the CSST recovered from the Benoit home were created by an electrical current.[11]

5.      However, Dr. Morse opined that the electrical charge that made the holes in the CSST did not originated from the lightning energy that flowed through the CSST on its path to ground.[12]  Instead, he contends that the electrical energy that made the holes came from a recessed can light that remained energized during the fire.[13]  Dr. Morse opined that, while the fire was progressing from above the carport to the attic over the living room, the electrical circuit that connected to the recessed can light remained energized.[14]  As the fire approached the can light in the living room,

---

[4] Exhibit A.
[5] *See* Report of Dr. Timothy Morse, attached as Exhibit B.
[6] Deposition of Dr. Timothy Morse, pg. 18, ll. 7-9., attached as Exhibit C.
[7] Exhibit C, pg. 18, ll. 1-25.
[8] Exhibit B, pg. 12-14.
[9] *See* Deposition of Dr. Timothy Morse, pg. 109-110, ll. 7-25, 1-2, attached as Exhibit C.
[10] Exhibit C, pg. 121, ll. 1-5.
[11] Exhibit B, pg. 24-25.
[12] *Id.*
[13] *Id.*
[14] *Id.*

LEGAL\33674189\1

the heat melted the insulation around the light's wiring inside the can.[15]  Eventually, the bare "hot" wire touched the light's frame, causing it to become energized.  Ignoring the probability that heat from the fire would have melted the circuit's insulation and caused it to short-circuit much sooner than when it reached the living room can light, Dr. Morse opined that the electricity from the energized frame jumped across to the CSST; thereby, creating the two holes.



6.      Dr. Morse's opinions are predicated on first calculating the amount of electrical energy it took to create the holes in the CSST, then—working backwards—calculating the amount of energy the lightning that struck the chimney cap possessed.    In arriving at his conclusions, Dr. Morse

---

[15] *Id.*

first tried to apply the *Hagenguth* formula (a method for measuring electrical energy based on the area of the hole created in sheet metal) to lightning damage found on the metal chimney cap.[16] Second, Dr. Morse used a different formula that required knowing the lightning's peak current and waveform. Not surprisingly, Dr. Morse opined that the lightning bolt did not possess a sufficient charge to create the size of the holes found on the CSST. As plaintiff will further show, there is no scientific bases that supports applying the *Hagenguth* formula to the damage found on the chimney cap. Further, Dr. Morse had to guess at the waveform for the lightning bolt because there is no data showing the actual waveform for the lighting that struck the chimney cap. Dr. Morse's opinions regarding the amount of energy the lightning bolt contained are unreliable and he should not be permitted to offer those opinions to the jury.

## II.    STANDARD FOR *DAUBERT* CHALLENGE

7.        Expert testimony is subject to the requirements of Federal Rule of Evidence 702. Under Rule 702, expert testimony is admissible only if 1) the expert is qualified, 2) the expert's methods are reliable, and 3) the expert's methods fit the facts of the case. See *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589-91 (1993); see also *Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("We have explained that Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."). This standard applies to scientific testimony as well as "testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999). The proponent of expert testimony bears the burden of showing that it satisfies the requirements of Rule 702. *Oddi v. Ford Motor Co.*, 234 F.3d 136, 144 (3d Cir. 2000).

---

[16] Exhibi B.

8.      A district court's task in assessing evidence proffered under Rule 702 is to determine whether the evidence "both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597. In determining reliability, the district court may consider "(1) whether the methodology can be and has been tested, (2) whether the theory or technique has been subjected to peer review, (3) the known or potential rate of error of the methodology employed, and (4) whether the methodology is generally accepted." *Hughes v. Kia Motors Corp.*, 766 F.3d 1317, 1328 (11th Cir. 2014) (citing *Daubert*, 509 U.S. at 593–94). The district court "is free to 'conclude that there is simply too great an analytical gap between the data and the opinion proffered.'" *Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). An expert who presents testimony must employ "in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

## III.   ARGUMENT

### A.    Summary of Objection to Dr. Morse's Opinions.

9.      The lightning bolt that struck Benoit's chimney cap damaged several points near the top of the cap.[17] All of the points where the lightning bolt hit the metal chimney cap melted some of the metal (also referred to pitting) but did not create a hole.  However, Dr. Morse opined that he believed that the lightning did create a "hole" along the seam for the chimney cap, where one piece of metal folded over a second piece.  Using the *Hagenguth* formula, Dr. Morse measured the chimney cap "hole" and concluded that it was created by a charge of 4.3 coulombs (4.3 C). Dr. Morse measured that it took 7 coulombs to create the two holes on the CSST using the same formula.  Dr. Morse concluded that the amount of charge deposited at the chimney cap was

---

[17] Exhibit A, pg. 20.

insufficient to create the two holes found along the Benoit home CSST.  Dr. Morse's opinion is fundamentally flawed because:

(1)    *Hagenguth* formula is only applicable when the electrical charge creates a hole in the sheet metal.  The electrical charge did not form a hole in the metal chimney cap;

(2)    the *Hagenguth* formula was developed based on experiments on a single sheets of flat metal.  The area of the chimney where Dr. Morse found a "hole" consisted of two metal sheets folded over each other.  There is no scientific literature or studies that support that *Hagenguth* formula can be applied to multiple layered sheets of metal;

(3)    the area of the hole and the thickness of the sheet of metal are critical variables that must be measured before applying the *Hagenguth* formula.  Dr. Morse did not measure the thickness of the two sheets of metal where he believe the "hole" was formed.

## 1.    A brief history of the *Hagenguth* experiments.

10.    During the 1940's, a scientist named J.H. Hagenguth conducted experiments to study the amount of electrical charge necessary to create holes in *thin* sheets of metal.[18]  Hagenguth determined that it was the amount of charge—measured in coulombs—that created holes in metal and not the amount of electrical current.[19]  Hagenguth experimented on different types of metal.[20]  However, his testing was restricted to flat single-layered metal sheets.[21]  Hagenguth concluded that the amount of coulombs in an electrical discharge that created a hole was a function of the hole's area and the thickness of the metal—the *Hagenguth* formula.

11.    Hagenguth observed that, often times, lightning would melt the metal where it hit, but it would not create a hole.[22]  Hagenguth referenced these areas as pitting.[23]  Hagenguth recognized

---

[18] McEachron, J.B., Hagenguth, J.H., *Effect of Lightning on Thin Metal Surfaces*, AIEE Transactions, Vol. 61, August 1942, attached as Exhibit D.
[19] *Id.*
[20] *Id.*
[21] *Id.*
[22] *Id.*
[23] *Id.*

that the pitting represented some level of electrical charge, but he was unable to correlate the size of pitting or melting to a specific number of coulumbs.[24]   Therefore, one of the overriding principles of Hagenguth' study is that the electrical energy must create a hole in order to accurately measure the number of coulombs that was deposited by lightning onto the metal sheet.

12.      Because CSST consists of a thin sheet of corrugated metal, the *Hagenguth* formula can be used to approximate the amount of charge (coulombs) created the hole.  Plaintiff and defendant's experts utilized a computer program that measured the area of holes in the Benoit home CSST as if the metal was on a flat plane.  All the experts concurred that a charge of in the range of 7 – 10 coulombs created the holes found on the CSST.[25]

### 2.   The lightning attachment at the chimney cap did not create a hole.  Therefore *Hagenguth* formula cannot be used to calculate the amount of charge.

13.      Dr. Morse incorrectly asserts that the lightning bolt created a hole at the chimney cap.



---

[24] *Id.*
[25] Exhibit A.

LEGAL\33674189\1

As depicted in Figure 3 above, there is not a complete hole through the layers of metal the make up the chimney's cap. The lightning bolt did not puncture a hole through the second layer of sheet metal that form the chimney cap's seam. In order accurately calculate the area of a hole to apply the *Hagenguth* formula, a through-and-through hole must exist in the metal service.[26] In contrast, the *Hagenguth* formula can be used to approximate the number of coulombs that made the holes in the CSST (*Fig. 4, below)* because there is a complete hole. There is empty space beyond the hole. You can clearly see the second piece of unburned metal underneath he "hole" that Dr. Morse discovered along the chimney cap. Clearly, the lightning energy did not perforate a complete hole.



The area of damage in the chimney cap that Dr. Morse opined was a "hole," more closely resembles the "pitting" or melting that Hagenguth observed in his studies.[27] Because lightning did not make a complete hole in the metal chimney cap, Hagenguth's paper specifically provided that the *Hagenguth* formula was not scientifically reliable to determine the amount of electrical charge that was deposited on the Benoit chimney cap.[28]

---

[26] Exhibit D.
[27] *Id.*
[28] *Id.*

**3.**    **There is no scientific literature or study that has applied *Haggenguth* formula to double-layered sheets of folded metal.**

14.    Hagenguth derived his formula after experimenting on single sheets of flat metal.[29]  To Plaintiff's knowledge, there are no studies or scientific literature that analyzed the application of Hagenguth's methodology to multiple layered metal sheets.  In fact, Dr. Morse simply ignores the existence of the second sheet of metal that is under the top sheet when describing how he applied the *Hagenguth* formula:

> "There is [a second sheet of metal], but at the very top that doesn't really come into play in the geometry, and that's not part of the portion that's melted.  So I think if we're focusing on the local geometry of where the melting occurred, *it's much more like a single piece of metal…* (Dr. Morse's Depo, pg. 144, ll. 11-14.

15.    Dr. Morse incorrectly described the layered metal sheet where he discovered the "hole." As depicted in Figure 5, the area where the "hole" was located consists of a piece of sheet metal folded over and connected to a second sheet of sheet metal.



---

[29] Exhibit D.

LEGAL\33674189\1

The area of melting along the crest was located at the top of the above-depicted curve.  Clearly, Dr. Morse's description that "it's much more like a single piece of metal" is false.  Dr. Morse further fails to cite any studies or scientific literature supporting the opinion that the *Hagenguth* formula can used to determine the amount of coulombs deposited by lightning on a metal sheet that has been folded over and conjoined with a second metal sheet.

#### 4.    Dr. Morse did not use the thickness of both metal sheets when applying the *Hagenguth* formula.

16.    Even assuming, *in arguendo*, that *Hagenguth* formula could be used to calculate the melting found on the Benoit home's chimney cap crest, Dr. Morse stated that he did not measure the thickness of both metal sheets.[30]  One of the two variables for the *Hagenguth* formula is metal sheet's thickness.  Dr. Morse testified that he believed that *Hagenguth* could be applied to two layers of sheet metal, by "just doubling the thickness of metal, and I think Hagenguth would apply pretty closely, you just have to double the thickness."[31]  However, Dr. Morse assumes—for his calculations—the top folded metal sheet was not in contact with the second sheet.[32]  As depicted in Fig. 5, above, Dr. Morse's assumption is inconsistent with the physical evidence from the Benoit chimney cap.

17.    Here, Dr. Morse did not measure the thickness of the second piece of adjoining (bottom) sheet metal.[33]  Although there is no support for applying the *Hagenguth* formula to the geometry where the chimney cap damage was located, Dr. Morse made no attempt to duplicate Hagenguth's principles (measuring entire thickness) for his calculations.  Simply, Dr. Morse ignored all the variables that are critical to accurately and reliably applying the *Hagenguth* formula to the melting

---

[30] Exhibit C, pg. 147, ll. 5-20.
[31] Exhibit C, pg. 143, ll. 8-14.
[32] Exhibit C, pg. 144, ll. 11-14.
[33] Exhibit C, pg. 147, ll. 8-20.

found at the chimney cap's crest in order to reach the conclusion that the lightning bolt had insufficient charge to create the holes found on the CSST. Thus, Dr. Morse should not be permitted to opine that charge deposited by the lightning bolt that struck the chimney cap was 4.3 coulombs.

**B.    Dr. Morse guessed at the value of a critical variable when making his second calculation as to the amount of coulombs discharged by the lightning on the chimney cap.**

18.    It is possible to calculate the amount of coulombs a particular lightning bolt possessed based on the peak current and waveform for the lightning. The peak current for lightning strikes that hit the ground are measured by the StrikeNet report.[34] Here, the experts agree that the lightning that struck the chimney cap had a peak current of 40.1 kA.[35]

19.    The second variable in the equation is the lightning's waveform. Generally, the waveform is the amount of time (measured in microseconds) it took the lightning bolt to reach its peak electrical current and the amount of time (measured in microseconds) it took the electrical current to decay to half its peak current.[36] The waveform is represented by a ratio formula of the rise rate compared to the decay rate (For example: 4.1 x 350). Generally, the longer the decay rate, the stronger the more coulombs.

20.    Because there was no instrumentation at the Benoit home to measure the waveform for the lightning bolt that struck the chimney, Dr. Morse does not know the specific waveform.[37]

---

[34] Exhibit B
[35] Exhibit B, pg. 7.
[36] Exhibit C, pg. 205, ll.10-23.
[37] Q.    You're using the median waveform here?

   A.    Yes.

   Q.    Okay. What's to prevent somebody from using a decay of 125 microseconds.

   A.    I mean, someone could do whatever calculation they want. I think given the information we have, the most appropriate value to use is the median value because it's most likely to be closet to the actual waveform.

Therefore, Dr. Morse was forced to assume a median waveform for a first negative return stroke (5.5 x 75) in his calculations.[38]  Dr. Morse obtained the median waveform from the <u>IEC Standard IEC62305-1 Protection Against Lightning (2006)</u>, a standard used for the design of lightning protection systems.    Dr. Morse admitted that the median is not the most likely waveform for the lightning the struck the Benoit chimney cap.[39]  Instead, the median waveform provides the 50th percentile (middle) for observed waveforms.  If analyzing 100 lightning strikes, 50 of those lightning strikes would have a longer decay rate and, therefore, more electrical charge.

21.     The only evidence that Dr. Morse cites to support the assumption that the actual waveform that struck the Benoit chimney was close to the median waveform he used in his calculation was his unreliable use of the *Hagenguth's* formula on the melting found on the chimney cap.  Dr. Morse admitted that he did not make any comparisons using different waveforms.[40]  Indeed, Dr. Morse admitted that, in the many cases involving Omega Flex that he has been retained to calculate the current waveform, he has never deviated from using the median current waveform.[41]

22.     Dr. Morse further ignores the generally accepted principle that the median amount of charge (coulombs) that a single negative stroke of lightning is 15 coulombs.[42]  Dr. Morse's adoption of the median current waveform—while simultaneously ignoring the median charge for a single flash—is inconsistent with the scientific method.  Because "median" is simply the middle

---

Exhibit C, pg. 206, ll. 11-16.
[38] Exhibit B.
[39] Q.    Well, median is not likely.  It's middle.

    Mr. Guilmartin:  Objection.  Is there a question?

Q.    I mean you would agree with me; right?

A.    Yeah.  And perhaps I should have said "most representative" instead of "most likely."
    Exhibit C, pg. 210, ll. 10-16.
[40] Exhibit C, pg. 211, ll. 4-21.
[41] Exhibit C., pg. 207, 7-12.
[42] *See* Exhibit A.

(50th percentile) of waveforms for observed lighting strikes, it holds no predictive value for the specific waveform for the lightning that struck the Benoit home.  Identifying the actual waveform that struck the home is critical to accurately measuring the amount of coulombs and assuming it was "close" to the median waveform is fundamentally unreliable.

23.     Courts routinely excluded expert opinion testimony that is based on questionable data or assumptions.  *See Leblanc v. Chevron USA, Inc.*, 396 Fed. Appx. 94, 98 (5th Cir. 2010); *see also Burst v. Shell Oil Co.*, 104 F. Supp.3d 7736, 779-80 (E.D. La. 2015).  Courts particularly critical of expert testimony based on assumptions and circular reasoning.  *See General Electric Co. v. Joinder*, 522 U.S. 136, 146 (1997).  The courts should not permit an expert to render opinion testimony the expert's opinion is connected to the data only by the *ipse dixit* of the expert.  *Id.* Here, Dr. Morse's calculation that the lightning bolt that struck the Benoit home deposited only 4.3 coulombs of charge is based solely on his use of the median current waveform for his calculations.  There is no evidence that the lightning's waveform was similar to the median waveform.  Moreover, the use of the median waveform is not statistically the most likely waveform for the lightning bolt that struck the Benoit home.  It's the middle or 50th percentile for negative strokes.

24.     The current waveform that Dr. Morse adopted for his opinion was simply a guess.  Similar to the expert opinions in *Leblanc* and *Burst* that guessed as to the level of chemical exposure that the injured plaintiffs may have sustained at their workplace, Dr. Morse makes the same guess as to the current waveform for the lightning bolt that struck the Benoit home.  Dr. Morse tries to bolster his calculations by relying on his own faulty use of the *Hagenguth* formula (as discussed *supra*) on the damage to the chimney cap.  Dr. Morse's adoption of the median current waveform for his calculation is scientifically unreliable and inconsistent with the generally accepted

principles that a median lightning strike has 15 coulombs.  Therefore, he should not be permitted to express the opinion that he calculated the

## IV.    CONCLUSION

25.      Dr. Morse's calculations and opinions regarding the amount of electrical energy the lightning bolt that struck the Benoit had are based on the unreliable assumption that the *Hagenguth* principles can be applied to the geometry and composition of the chimney cap.  Dr. Morse does not provide any supporting scientific literature or testing to support that opinion. Second, his use of the median waveform is a guess. There is no evidence to support that the median waveform was more likely than not the correct waveform.  Dr. Morse's opinion do not pass the requirement of *Daubert* and its progeny.  Therefore, Dr. Morse should not be allowed to offer these opinions during the trial of this matter.

Respectfully submitted,

**COZEN O'CONNOR**

Jake P. Skaggs (#33454)
LyondellBasell Tower
1221 McKinney, Suite 2900
Houston, Texas 77010
Telephone: (832) 214-3900
Facsimile: (832) 214-3905

ATTORNEYS FOR PLAINTIFF

LEGAL\33674189\1

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was sent via eservice and/or facsimile on this the 18th day of December, 2017 to the following:

David R. Frohn
Manion Gaynor & Manning
2201 Lake Street, Suite 106
Lake Charles, LA 70601

Cullen W. Guilmartin
Gordon Rees Scully Mansukhani
95 Glastonbury Boulevard, Suite 206
Glastonbury, CT 06033
*Attorneys for Defendant*


_____

Jake P. Skaggs

LEGAL\33674189\1